**Clyde L. POWELL, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 12463.**

United States Court of Appeals District of Columbia Circuit.

Argued April 21, 1955.

Decided July 28, 1955.

Petition for Rehearing Denied Oct. 5, 1955.

1. D.C.Cir., 1955, 96 U.S.App.D.C. ——, 226 F.2d 266.

☞21

Mr. Daniel B. Maher, Washington, D. C., for appellant. Mr. Charles B. Murray, Washington, D. C., also entered an appearance for appellant.

Mr. Max H. Goldschein, of the bar of the Supreme Court of Tennessee, pro hac vice, by special leave of Court, with whom Mr. Leo A. Rover, U. S. Atty., and Mr. John J. Sexton, Jr., Sp. Asst. to the Atty. Gen., were on the brief, for appellee.

Before PRETTYMAN, WASHING-TON and DANAHER, Circuit Judges.

PRETTYMAN, Circuit Judge.

Appellant Powell was convicted by the District Court, without a jury, upon a presentment by the Grand Jury for contempt in that he gave "obstructive and contumacious" answers to questions propounded to him and in that he disobeyed an order of the court that he answer. The evidence upon the trial consisted of transcripts of the Grand Jury proceedings and affidavits filed by Powell, accepted as evidence and uncontradicted. Found guilty, he was sentenced to imprisonment for one year.

Because of the view we take of the case we must relate the events in some detail. Powell was subpoenaed to appear before the Grand Jury and to bring with him his "official diaries" as Assistant Commissioner of Rental Housing for the Federal Housing Administration from 1946 to 1954. He appeared and, being asked to produce the diaries, replied: "I have no such diaries. * * * They were left—whatever I had was left in my office." Asked, "Did you take any of those diaries out of your office?", he replied, "No, sir." The prosecutor then asked, "Who kept the diaries in your office?". Powell refused to answer, invoking his Fifth Amendment privilege against self-incrimination.

The precise situation at this point is to be noted carefully. The question to which Powell pleaded the privilege was "who kept" the diaries. He had testified without objection or equivocation that he had no diaries, that whatever he had was left in the office, and, in response to the question whether he took any of the diaries out of the office, he had answered a categorical "No, sir." The prosecutor's next inquiry was so framed that it could have referred to Powell himself or to some other person. This was the question to which Powell claimed the privilege. We will notice as we proceed that this particular question was never renewed. We also now note that the word "kept", in relation to the diaries, plagues the consideration throughout. A person may "keep" a diary by making entries in a book, or, we suppose, one may "keep" a diary by retaining physical possession of the book. The former is the usual meaning, but it is somewhat difficult to tell whether that is the meaning in which the prosecutor used it in this case. Further we note that it had not been established that there actually were any diaries. Later it appears there were none in the usual sense of the word. However that may be, the prosecutor assumed throughout that there were diaries.

The prosecutor continued: "Mr. Powell, you say you did not take those diaries from your office when you left?". Powell

replied: "My answer remains as heretofore given." It is to be noted that in this question the prosecutor repeated to Powell an answer which Powell had theretofore made and called on him to reaffirm (or to disavow) it. Powell reasserted his prior answer, which was as the prosecutor had recited it. Privilege was not remotely involved in this exchange. The prosecutor repeated the question, again reciting Powell's answer that he did not take any diaries from his office, and Powell replied again that his answer remained the same. There is no room for doubt that the prosecutor knew that Powell had answered that question and knew what the answer had been; the prosecutor himself twice recited the answer.

The prosecutor then changed the line of questioning and asked, "Where are your official diaries for the year 1946?". The same question was asked for each year through 1954. To each of these questions Powell replied that his answer remained "as heretofore given" or in some similar phrase. This answer may have been ambiguous. Powell had never specifically answered a question as to "where". He had said he had no diaries, and he had claimed the privilege as to "who" kept them. At this point, then, his reference to an answer "heretofore given" may have been to either of those answers. However that may be, the matter is immaterial, because Powell was not charged in the presentment with refusing to answer questions as to "who" or "where".

The prosecutor returned to his original line of questioning and asked, "Will you tell this Grand Jury whether or not you took any of those diaries from your office?". He repeated that question in slightly different words, and both times Powell replied that his answer remained the same. Thus four times the prosecutor repeated his original question whether Powell took the diaries, and four times Powell adhered to his original answer. Then the prosecutor asked the direct question whether Powell claimed the privilege on that question, and finally Powell said, "I refuse to answer on my constitutional privilege."

All the foregoing occurred in the Grand Jury room. The only persons present were the Grand Jurors, the prosecutor, Powell, and the reporter. Counsel for Powell was not present, and no other observer was there.

Powell was taken immediately into court. No transcript of the Grand Jury proceedings was then available. The proceedings were described to the court by the prosecutor. The prosecutor's statement was as follows:

"Mr. Powell appeared before the Grand Jury and, when questioned as to whether or not he had the diaries with him, he said he did not. When he was asked whether or not he took the diary for each specific year and he was asked about from 1946–47 through to 1954, whether he took those diaries from his official office at the Federal Housing Authority, he claimed his constitutional privilege against self incrimination."

The foregoing statement of the prosecutor was inaccurate and incomplete. When Powell had been asked whether he took the diaries, he answered, as we have already seen, that he had no diaries and that whatever he had was left in the office. It was after he had repeated four times that his answer to that question remained "as heretofore given" that he finally claimed the privilege on that question. Moreover the prosecutor had not asked Powell whether he took the diaries for each specific year 1946 through 1954 but had asked him "where" those diaries were, a very different question.

Counsel for the defense took a clear position. He said: "If that is the factual situation, as stated by Mr. Goldschein [the prosecutor]," the witness should answer the question. In a colloquy with the court the question was made unmistakably clear. The court itself stated it: "The question is whether he took them [the diaries] when he left his official office." The prosecutor

agreed that that was the question, and counsel for the defense said, "Your Honor, if that is the question alone, I submit he should answer it." The court then directed Powell to answer that question before the Grand Jury.

The importance of the inaccuracy of the prosecutor's recitation to the court is apparent and becomes more so. The court was not made aware that Powell had repeatedly answered the question to which he later claimed the privilege and which the court was being urged to direct him to answer.

Powell was forthwith returned to the Grand Jury. The prosecutor inquired as to whether he (Powell) had heard the direction of the court with reference to answering "certain questions" and announced that he was going to repeat "those questions". He then asked, "Mr. Powell, did you remove from your office, as Assistant Commissioner of Rental Housing for the Federal Housing Administration for the United States your official diary for the year 1946?". Powell answered, "I kept no official diary." Thus Powell made a categorical answer, unqualified, to the question which the prosecutor put to him as being the question which the court had directed him to answer. When the question was repeated he replied that he had answered it.

Then the prosecutor asked about desk pads—a desk calendar or an appointment book—upon which appointments were noted. It is of course obvious that a diary and an appointment pad or book are, to common and universal understanding, totally different things. A diary is a record of the past, kept contemporaneously with events or thereafter. An appointment pad, calendar or book is a schedule for the future. However that may be, Powell answered, "Such information would be kept by my secretary." The next question was: "All right; on a desk calendar or what? How would she keep it?". And the answer: "I am not sure exactly; probably on the appointment book." He said he

wouldn't know where such appointment records went. Asked, "Did you ever have it?", he replied, "No, sir." Asked what happened to it, he said, "It stayed there." The following colloquy occurred:

"Question: 1946 didn't stay there, did it?

"Answer: I will answer your question by saying that I have removed nothing from my office while I was connected with the Federal Housing Administration up to the time I resigned except my personal belongings and my personal papers.

"Question: We were not present when you removed your personal belongings and we don't know what you consider personal or what you consider official, and I am, therefore, asking you to tell the Grand Jury whether or not you took those calendar pads with you when you left.

"Answer: I did not. All official documents belonging to the Government and having anything to do with Government business were left in the FHA.

"Question: All right. Did you see the desk calendar which you kept on your desk after 1946?

"Answer: I will answer that by saying I took nothing out of my office."

The prosecutor then returned to the subject of the diaries. He asked, "For the year 1946, Mr. Powell, did you take the diary from your office?", and Powell answered, "I have answered your question." The prosecutor then asked the same question for each of the years through 1954, and Powell answered, "I have answered your question." Thus ended that session before the Grand Jury.

It is to be noted that Powell answered every question asked him at this resumed session of the Grand Jury, either explicitly or by reference to a previous answer. During this appearance before the Grand Jury, after the order of the

court, Powell did not mention his constitutional privilege. When he was asked the first time at this session whether he removed the official diary for 1946, he replied, "I kept no official diary", and when asked the same question the second time he replied, "I have answered your question." And he had answered it. Asked the same question about the other years he replied that he had answered the question, and it is certainly obvious that his answer first given was all-inclusive and related to all years.

Some days later Powell was again taken before the court. Again the prosecutor gave the court a resume of part of the Grand Jury proceeding, and he read to the court an account of the remainder of that proceeding. The prosecutor began by saying that the court had instructed Powell to answer the question whether he took from his office "the official diary for the year 1946, the official diary for the year 1947", and so on through the year 1954. He then told the court that Powell had stated to the Grand Jury "that he had taken no official records from his office; that all he took was his personal records but when asked the specific question with reference to the official diaries for the specified years I just enumerated, all he would answer is, 'I have answered your question.'"

The latter statement of the prosecutor was inaccurate. "I have answered your question" was not "all" Powell would answer. When he had been asked the specific question with reference to the specified year 1946, he had answered "I kept no official diary." The prosecutor failed to tell the court that key fact.

The prosecutor emphasized to the court that Powell "deliberately refuses to answer whether or not he took these specific diaries from his office." That statement was grossly inaccurate.

It is not clear whether any transcript of the Grand Jury proceedings was before the court. It is clear that the record of the former court proceedings had not been transcribed, and counsel for the defense made the statement that "I don't have the transcript"; but the prosecutor read to the court part of what appeared to be the reporter's transcript, although he did not read it all.

Defense counsel, having said that he did not have the transcript, asserted Powell's privilege under the Fifth Amendment, and that question was argued. At the conclusion of the argument the court pointed out that before the Grand Jury Powell had not invoked the privilege but had "made a general answer that he had not taken anything away. * * * And when he was asked specifically he asserted that he had answered the questions." The court said Powell had not put a refusal to answer on the Fifth Amendment ground but on the ground that he had already answered. The court said: "He simply asserted that he had already answered the questions."

Counsel for the defense then said: "As I see the matter, the case is not presently in the posture where the Court desires to rule upon the question of the Fifth Amendment." And the court replied, "I don't see that element in the case this morning." The court then directed that Powell be taken again before the Grand Jury, and it directed him to answer "the questions". Defense counsel asked that the questions be enumerated. The court and the prosecutor both said that the questions had been read into the record. They were specific questions, which had been read to the court, as to whether Powell had taken "the calendar pad or desk pad you use as a diary" for 1946, "the desk calendar or your appointment diary" for 1947, and "your diary" or "your official diary" for the years 1948 through 1954.

Two things are to be noted at this point. The court acted upon the premise, which was correct, that Powell had not claimed his privilege under the Fifth Amendment in respect to the questions which he was being instructed to answer. The court also acted without full or accurate information as to the answers

which Powell had made to the Grand Jury, either upon his first or upon his second appearance there.

Powell was returned to the Grand Jury, and, when the questions which had been read in open court were put to him, he asserted and relied upon his privilege under the Fifth Amendment. Thereupon the Grand Jury returned against him the presentment for contempt, reciting that he gave obstructive and contumacious answers to questions propounded to him and that he disobeyed orders of the court directing him to answer. The questions upon which the presentment was based, as recited therein, were the questions as to whether Powell took his diaries from his office. Ten such questions were recited, one general, covering all years, and the others specific, one for each year 1946–1954.

The court found that Powell "wilfully, deliberately and contumaciously" refused to answer the questions and disobeyed the order of the court.

A serious constitutional question casts its shadow *sua sponte* upon the very threshold of our consideration. Powell showed, clearly and convincingly, by affidavits and exhibits, that he was the person against whom an indictment was being sought by this Grand Jury investigation. He included this evidence in support of a motion to quash the subpoena served upon him. He showed, *inter alia*, that the Attorney General, mentioning "bribery and other criminal conduct in the Federal Housing Program", had specifically directed the United States Attorney to present to the Grand Jury "evidence of the activities of Clyde L. Powell". Under these circumstances there is a serious question whether Powell was subject to subpoena as a witness for the Government. The mandate of the Constitution is that no person can be compelled "to be a witness against himself". The language is "to be a witness". The courts have expanded the simple constitutional provision so as to protect persons who are properly witnesses; they cannot be compelled to give incriminating evidence. But that is a derivative doctrine. The constitutional clause applies directly and with simplicity to the person who is accused; he cannot be compelled "to be a witness".

On the one extreme it would seem to be clear that a prosecutor could not even call to the stand in a criminal trial the person being tried. On the other extreme it would seem to be clear that a person summoned to appear before a Grand Jury could not validly ignore the subpoena merely because an indictment against him might eventuate from the inquiry. Somewhere between the two extremes is a line.[1] No doubt it would be a boon to prosecutors if they could summon before a Grand Jury a person against whom an indictment is being sought and there interrogate him, isolated from the protection of counsel and presiding judge and insulated from the critical observation of the public. But there is a serious question whether our jurisprudence, fortified by constitutional declaration, permits that procedure.[2] However, in the view which we take of the case at bar, we do not reach this constitutional question, avoiding it as we should when it is possible to do so.

Powell had answered the questions which were the subject matter of both orders of the court and of the presentment. Almost the first question put to him upon his first appearance before the Grand Jury was the flat inquiry "Did you take any of those diaries out of your office?". He answered that question with a categorical "No, sir." Yet an alleged refusal to answer that question was the basis of his conviction for contempt. Furthermore, he also answered

---

1. See the extensive discussion of the policy of the privilege in various situations in 8 Wigmore, Evidence § 2251 (3d ed. 1940), especially subsection 2 of that section.

2. See United States v. Lawn, 115 F.Supp. 674 (D.C.S.D.N.Y.1953), and 38 A.L.R. 2d 290, and authorities there collected.

that same inquiry in other terms. Asked about "official diaries" he said, "I have no such diaries", and "I kept no official diary." Asked about calendar pads and appointment books, he said he did not keep them, he did not know what became of them, he took no official documents having anything to do with Government business, that all such documents were left in the FHA and he took nothing of that sort out of his office. These answers were direct, succinct, plain of meaning, and, if true, were all the witness could say. At that point he may have been guilty of perjury, but he certainly was not guilty of refusing to answer and his answers were not "obstructive" or "contumacious". To the succeeding repetitions of the identical question related to separate years, Powell replied that he had answered the question. And he had. His replies that he had already answered were not, as was pictured to the court, refusals to answer but were references to a real answer already made.

■ The finding of the court upon the trial for contempt, to the effect that Powell had failed to answer and was obstructive, disobedient, etc., was erroneous. The court had been misled, because it had not been informed early in the proceedings fully or accurately what had transpired before the Grand Jury. The finding was without support in the evidence, was contrary to the evidence, and must be set aside. The conviction rested upon that finding and falls with it.

In the foregoing view of the case no question of privilege arises. However, it is argued that, if the proceeding is broken down into separate stages and the third (the last) stage considered separately, it must be held that Powell refused to answer and was in contempt. We think not. In the first place this whole phase of the matter—the order of the court, the presentment, the finding, and the conviction in respect to the third Grand Jury session—was bottomed upon a false premise. It proceeded upon the erroneous assumption that Powell had not already answered the questions and must answer them in furtherance of the Grand Jury's inquiry. Common justice dictates that so dire a consequence as a year's imprisonment not be permitted to stand when its foundation disappears. In the second place Powell did not at this point, as the presentment charged and the court found, contumaciously refuse to answer. He claimed his constitutional privilege.

For the purpose of considering this argument respecting the third Grand Jury session separately, we must take one or the other of two views—either Powell had already answered the questions or he had not already answered them. If we take the former view (which is the one we do take), the case is disposed of upon the ground we have already discussed, that the trial court's final adjudication of contumacy was error. In that view the problem of the privilege does not arise.

■ If we take the other view, that prior to his third appearance before the Grand Jury Powell had not answered the questions, we must determine the validity of the claim of the privilege. We think the claim was valid. Powell knew, and we know from the record, that an indictment was being sought against him on account of activities while he was at the Federal Housing Administration. If there were diaries of his tour of duty there, and if he removed those diaries from the office when he left it, that fact would certainly tend to criminate him. So from that point of view he could not be compelled to answer that question. Moreover, from another point of view, the one urged upon the trial court by defense counsel, the privilege applied. If there were diaries, and if they were official diaries and thus official Government documents, and if Powell removed those documents from the office, he was guilty of a crime. A statute makes it a felony to remove Government docu-

ments without authority:[3] So Powell could not be compelled to answer the question whether he took those documents from the office. The scope and meaning of the Self-Incrimination Clause have been restated emphatically by the Supreme Court as recently as two months ago in the opinion of Chief Justice Warren in Quinn v. United States.[4]

 It is, of course, well-established, as illustrated by such cases as United States v. United Mine Workers[5] and Land v. Dollar,[6] that a person must comply with an order of a court whether the order is valid or invalid, until judicial action stays or sets aside the order. But that rule does not apply when the constitutional privilege against self-incrimination is involved. In that case the duty to comply with the direction of the court depends not upon the mere existence of the court order but upon the validity of the claim of the privilege. A person is not in contempt if he rightly claims the privilege.

It is said Powell had no privilege, because he had already answered and so opened the door to further questioning under the Rogers doctrine.[7] But his earlier answers had been that he had no diaries, and so he did not open any door. If he had said he had the diaries and then refused to testify further about them, the privilege might not lie; this might be the Rogers doctrine. We think the Rogers doctrine does not apply to Powell's claim of the privilege in response to the ten questions put to him upon his third appearance before the Grand Jury.

Again, as to the claim of privilege, it is said that Powell had no privilege at this point, because the privilege does not apply to the production of Government papers. Powell was not charged with failure to produce, failure to obey the subpoena. He was charged with failure to answer questions as to whether he took his diaries with him when he left his office. That called for testimony, and the privilege applied to it.

It may be that the trial court, at the session it held with Powell before his third appearance before the Grand Jury, could have ordered Powell to repeat again to the Grand Jury the answers he had theretofore given. It did not do so. The record shows the court had no such idea in mind. If it had, and if the case were presented on that basis, we would have the problem whether the court abused its discretion in ordering a witness, subject to punishment for contempt for refusing to obey, to answer again questions he had already repeatedly answered. We do not have that problem.

The Government faces a dilemma. Either Powell, when he appeared before the Grand Jury the third time, had not answered the questions and so had the privilege of refusing to incriminate himself when he was asked them, or he had answered the questions and the Government was guilty of an outrageous misrepresentation to the trial court concerning what had transpired before the Grand Jury. If the former be the case, Powell cannot be convicted for exercising the privilege. If the latter be the case, certainly no appellate court will consciously permit an injustice thus unwittingly committed by a trial court to stand.

The judgment of conviction is reversed and the case remanded to the District Court with instructions to enter a judgment of acquittal.

Reversed and remanded.

3. 62 Stat. 725 (1948), 18 U.S.C. § 641.

4. 349 U.S. 155, 75 S.Ct. 668 (1955).

5. 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

6. 88 U.S.App.D.C. 311, 190 F.2d 366 (D.C.Cir., 1951).

7. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951).