**In re Grand Jury Proceedings, George Gordon LIDDY, Appellant.**

**No. 73–1562.**

United States Court of Appeals, Distict of Columbia Circuit.

Argued June 14, 1974.

Decided Oct. 10, 1974.

---

4. *See also* NLRB v. Wyman-Gordon Co., 394 U.S. 759, 775–780, 89 S.Ct. 1426, 22

L.Ed.2d 709 (1969) (Douglas, J., dissenting).

Peter L. Maroulis, Poughkeepsie, N. Y., for appellants. Thomas A. Kennelly, Washington, D. C., also entered an appearance for appellant.

Sidney M. Glazer, Asst. Sp. Prosecutor for appellee. Leon Jaworski, Sp. Prosecutor, Philip A. Lacovara, Counsel for the Sp. Prosecutor, Richard D. Weinberg, and Robert L. Palmer, Asst. Counsel to the Sp. Prosecutor, were on the brief for appellee. Archibald Cox, Sp. Prosecutor at the time the brief was filed, was on the brief for appellee.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, LEVENTHAL, ROBINSON, MacKINNON and WILKEY, Circuit Judges, sitting en banc.

WILKEY, Circuit Judge:

Appellant George Gordon Liddy seeks reversal of an order of civil contempt which the District Court entered against him on 3 April 1973.[1] The contempt order issued when Liddy persisted in asserting his Fifth Amendment privilege against self-incrimination in response to questioning before the 5 June 1972 Watergate grand jury, despite a District Court order granting him conpulsory immunity pursuant to 18 U.S.C. § 6002.[2]

1. Appendix to Appellant's Brief [hereinafter A.App.] at 20–21.

2. § 6002. Immunity generally
 Whenever a witness refuses, on the basis of his privilege against self-incrimination,

The District Court found that there was no "just cause" for Liddy's contumacy and, pursuant to 28 U.S.C. § 1826,[3] ordered that Liddy "be confined until such time as he is willing to testify as ordered," with the period of confinement not to exceed the life of the grand jury including extensions,[4] but in any case not more than eighteen months.

Liddy argues that his status in relation to the grand jury was not that of an ordinary witness, and therefore that the District Court acted improperly when it granted him compulsory immunity under section 6002 and ordered him to testify. The invalidity of this order, Liddy contends, vitiates the court's subsequent civil contempt judgment. We reject Liddy's arguments and affirm the contempt order.

## I. FACTUAL BACKGROUND

On 15 September 1972 the 5 June 1972 federal grand jury returned an eight count indictment charging Liddy and six other persons with offenses committed in connection with the break-in at the Democratic National Committee (DNC) headquarters in the Watergate apartment complex on 17 June 1972. Six of the counts charged Liddy with conspiracy,[5] burglary,[6] and illegal interception of oral and wire communications.[7]

At his trial in District Court Liddy declined to take the witness stand on his own behalf. On 30 January 1973 the jury returned a verdict of guilty on all six charges against Liddy.[8] On 23 March 1973 the District Court sentenced Liddy to imprisonment for a term of

---

to testify or provide other information in a proceeding before or ancillary to—

(1) a court or grand jury of the United States,

(2) an agency of the United States, or

(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

18 U.S.C. § 6002 (1970).

3. § 1826. Recalcitrant witnesses

(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—

(1) the court proceeding, or

(2) the term of the grand jury, including extensions,

before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

(b) No person confined pursuant to subsection (a) of this section shall be admitted to bail pending the determination of an appeal taken by him from the order for his confinement if it appears that the appeal is frivolous or taken for delay. Any appeal from an order of confinement under this section shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal.

28 U.S.C. § 1826 (1970).

4. By order of 3 December 1973 the District Court extended the grand jury's term to 4 June 1974. A further extension through 4 December 1974 was granted by order of 31 May 1974. Authority for these extensions was provided by Act of 30 November 1973, Pub.L.No.93–172, 87 Stat. 691.

5. 18 U.S.C. § 371 (1970).

6. 22 D.C.Code § 1801(b) (1970).

7. 18 U.S.C. § 2511 (1970).

On 20, 25, and 26 July 1972 Liddy had appeared and testified before the grand jury. Although he invoked the privilege against self-incrimination in response to many of the questions put to him, no attempt was made to compel his testimony by granting him compulsory immunity.

8. This conviction is the subject of a separate appeal in this court. United States v. Liddy, No. 73–1565.

not less than six years and eight months and not more than twenty years and imposed a fine of $40,000.

Three days after Liddy was sentenced he was summoned before the 5 June 1972 grand jury, which had returned the indictment on which his conviction was based.[9] An Assistant United States Attorney questioned Liddy regarding several aspects of the Watergate break-in. The questions related to four basic subjects: 1) Liddy's own activities in connection with the electronic surveillance and burglary of the DNC and his actions in the aftermath of the break-in;[10] 2) Liddy's meetings and contacts with other persons before and after the break-in;[11] 3) the involvement in or knowledge of the break-in on the part of persons other than the seven co-defendants;[12] and 4) surveillance activity directed at candidates or potential candidates for federal office in 1972.[13] In response to these questions Liddy consistently refused to answer on the ground that to do so might incriminate him.[14]

Liddy's co-defendant at trial, James W. McCord, Jr., was also convicted on all counts in which he was indicted. His appeal, United States v. McCord, No. 73–2252, is now pending before this court. Of the other persons named in the indictment with Liddy, Everette Howard Hunt, Jr., pleaded guilty to all the counts against him on 11 January 1973, and Bernard L. Barker, Eugenio R. Martinez, Frank A. Sturgis, and Virgilio R. Gonzalez entered guilty pleas to all indictment counts in which they were named on 15 January 1973. The District Court subsequently refused to allow these defendants to withdraw their guilty pleas, and they have appealed to this court. United States v. Hunt, No. 73–2199; United States v. Barker, No. 73–2185; United States v. Martinez, No. 73–2186; United States v. Sturgis, No. 73–2187; United States v. Gonzalez, No. 73–2188.

9. When asked by an Assistant United States Attorney whether it would be necessary to advise him of his rights under the Fifth and Sixth Amendments, Liddy responded, "Inasmuch as I am represented by my counsel who is present just outside the door of the grand jury I don't believe that will be necessary." Hearing Transcript (26 March) [hereinafter H.T.(26)] at 10, A.App. at 48. During his 26 March and 30 March appearances before the grand jury, Liddy frequently left the grand jury room to consult with his counsel.

10. Under this category of questions, Liddy was asked: when he had signed out from the offices of the Finance Committee to Reelect the President (the Finance Committee) on the evening of 16 June 1972 (H.T.(26) at 10, A.App. at 48) ; whether he had been present at the Finance Committee headquarters on the evening of 16 June 1972 (H.T.(26) at 12, A.App. at 50) ; whether during May or June 1972 he had received logs of overheard telephone conversations from Alfred Baldwin or James McCord (H.T.(26) at 15–17, A. App. at 53–55) ; whether he had gone to Finance Committee headquarters on the morning of 17 June 1972 (H.T.(26) at 20, A.App. at 58) ; whether he had furnished anyone any information from logs of overheard conversations (H.T.(26) at 20, A.App. at 58) ; whether he had used the shredder at the Finance Committee headquarters on 17 June 1972 (H.T.(26) at 23, A.App. at 61).

11. On this general subject, Liddy was asked: whether he had met with McCord at Finance Committee headquarters on the evening of 16 June 1972 (H.T.(26) at 13, A.App. at 51) ; whether he had seen Hugh Sloan at the Finance Committee on 17 June 1972 (H.T.(26) at 20, A.App. at 58) ; whether during May or June 1972 he had discussed taps of DNC telephones with anyone (H.T.(26) at 21, A.App. at 59) ; whether he had discussed logs of overheard telephone conversations with anyone except his six co-defendants (H.T.(26) at 22, A.App. at 60) ; with whom he had discussed the Watergate break-in after 17 June 1972, other than his lawyer and co-defendants (H.T.(26) at 22–23, A.App. at 60–61).

12. Questions on this subject were: whether Liddy knew of anyone who had advance knowledge of the Watergate break-in (H.T. (26) at 18, A.App. at 56) ; whether anyone other than he and his six co-defendants had knowledge of the break-in (H.T.(26) at 19, A. App. at 57).

13. H.T.(26) at 19, A.App. at 57.

14. In several instances he also asserted the attorney-client privilege of his alleged client, E. Howard Hunt. However, at the hearing on the Government's motion to grant Liddy immunity, the Goverment represented that Hunt had waived his attorney-client privilege with respect to 1972, and Hunt's counsel confirmed this assertion. Hearing Transcript (30 March) [hereinafter H.T.(30)] at 16–17, A.App. at 80–81. The District Court implicitly rejected Liddy's claim of attorney-client privilege by ordering him to testify. Liddy has not pressed this issue further.

At a subsequent hearing before the District Court on 26 March the Government requested that the court grant Liddy immunity under 18 U.S.C. § 6002 and order him to testify before the grand jury. The transcript of Liddy's grand jury appearance was read to the court, which deferred ruling on the Government's motion until 30 March to permit Liddy's counsel to prepare an argument in opposition. At the 30 March hearing counsel for Liddy opposed the Government's motion on the basis of essentially the same arguments advanced on Liddy's behalf in this court,[15] including the contention that Liddy was a target of the grand jury's investigation and therefore could not be compelled to testify. The Government disclaimed any intention to seek further indictments against Liddy.[16] The District Court granted the Government's motion and ordered Liddy to "appear before the Grand Jury and give testimony or provide other information which he has refused to give or provide . . . as to all matters about which he may be interrogated before said Grand Jury."[17] The court conferred "use and derivative use" immunity[18] upon Liddy pursuant to 18 U.S.C. § 6002.

When Liddy was taken before the grand jury on 30 March, he again refused to answer questions relating to the Watergate electronic surveillance and break-in[19] on the ground of his Fifth Amendment privilege against self-incrimination. His attitude toward the grand jury interrogation was elicited by an Assistant United States Attorney in the following exchange:

Q. Well, let me ask you this question. Is there any question or any classification of subject matter that we can discuss in here, in this grand jury room, relating directly or indirectly to the events, both prior to and subsequent to, and the event itself of June 16th and 17th, 1972, which you feel you could give information about or answer questions about without invoking your self-incrimination privilege?

A. My best evaluation and my best judgment on that, without hearing a specific question—my best judgment in response to that question would be no.[20]

At a hearing on 3 April 1973 the transcript of Liddy's 30 March grand jury appearance was read to the District Court. Upon the Government's motion to adjudicate Liddy in contempt, the court issued an order that provided, in pertinent part:

The Court finds that George Gordon Liddy has, without just cause, refused to testify before the grand jury as ordered by this Court on March 30,

---

15. H.T.(30) at 5–9, A.App. at 69–73.

16. H.T.(30) at 12–13, A.App. at 76–77.

17. A.App. at 8. This order was entered pursuant to the authority of 18 U.S.C. § 6003 (1970).

18. *See* notes 24–25 *infra* and accompanying text.

19. Liddy was again asked many of the questions put to him during his 26 March grand jury appearance. *See* notes 10–13 *supra* and accompanying text. In addition, Government attorneys questioned him on the following subjects: whether he had learned from any source what the purposes of the Watergate break-in were, Hearing Transcript (3 April) [hereinafter H.T.(3)] at 18, A.App. at 102 (The transcript of Liddy's 30 March grand jury appearance was read to the District Court at the contempt proceeding on 3 April 1973. All references are to the transcript

of the contempt proceeding.); when he had been employed at the Committee to Re-elect the President (CRP) and the Finance Committee to Re-elect the President (H.T.(3) at 20, 22, A.App. at 104, 106); who had interviewed and recommended him for his jobs at the CRP and the Finance Committee (H.T. (3) at 22, A.App. at 106); whether he knew what the purposes of the Watergate break-in were (H.T.(3) at 24, A.App. at 108); whether Hugh Sloan had transferred $192,000 to him and what he had done with any sums disbursed to him by Sloan (H.T.(3) at 25–26, A.App. at 109–10); whether Jeb Magruder had authorized any disbursements to Liddy by Sloan (H.T.(3) at 26, A.App. at 110); whether Sloan had turned over $89,000 worth of Mexican checks to Liddy (H.T.(3) at 27, A.App. at 111).

20. H.T. (3) at 15–16, A.App. at 99–100.

1973. The provisions of Title 28, United States Code § 1826 are thus made applicable. Pursuant to that statute, the Court this *3rd* day of April, 1973,

ORDERS that Mr. Liddy be confined until such time as he is willing to testify as ordered; provided, however, that the period of confinement shall not exceed the life of the grand jury, including extensions, and shall in no case exceed eighteen (18) months . . . .[21]

The court further ordered that "[t]hat to give meaning and coercive impact to the Court's contempt powers in the interest of protecting the Court's integrity, the Court here finds it necessary to hold in abeyance the execution of Mr. Liddy's sentence under the indictment [for burglary, conspiracy, and wiretapping] pending his confinement for contempt."[22] This appeal followed.

## II. VALIDITY OF THE DISTRICT COURT'S ORDER TO TESTIFY AND RESULTING CONTEMPT JUDGMENT

Insofar as Liddy's attack on his contempt conviction rests on his Fifth Amendment privilege against self-incrimination, the Supreme Court's 1973 decision in Kastigar v. United States [23] seems fatal to his position. *Kastigar* resolved a challenge to the immunity clause of 18 U.S.C. § 6002, which provides that when a presiding court orders a contumacious witness to testify before a grand jury, "no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or information) may be used against the witness

in any criminal case . . . ."[24] In upholding the validity of this "use and derivative use" immunity, the Court in *Kastigar* stated:

We conclude that the immunity provided by 18 U.S.C. § 6002 leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege. The immunity therefore is coextensive with the privilege and suffices to supplant it.[25]

Since the District Court's 30 March order to testify granted Liddy immunity under section 6002, had Liddy testified he would have been "in substantially the same position as if [he] had claimed the Fifth Amendment privilege." Thus, he could "not refuse to comply with the order [to testify] on the basis of his privilege . . . ."[26] His further contumacy subjected him to a contempt judgment under 28 U.S.C. § 1826.

However, Liddy argues that section 6002 immunity, as interpreted and sanctioned by *Kastigar*, was intended for use only when an "ordinary witness" asserts his Fifth Amendment privilege as a ground for refusing to testify. When he appeared before the Watergate grand jury on 26 and 30 March 1973, Liddy avers, he was not an ordinary witness. Rather, his status was such that he was entitled to remain silent despite the District Court's order granting him use and derivative use immunity. Liddy characterizes his allegedly extraordinary status before the Watergate grand jury in several fashions:

A. *Defendant.* Since the Watergate grand jury had indicted him in September 1972, Liddy argues, he appeared before it as a "defendant" who could exer-

---

21. A.App. at 20.

22. A.App. at 22–23. The suspension of Liddy's sentence is the subject of an appeal to this court in *United States v. Liddy, No. 73–1564.*

23. 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

24. Section 6002 is set out in full in note 2 *supra.*

25. 406 U.S. at 462, 92 S.Ct. 1653, at 1666. In order to effectuate the protection conferred by section 6002, the Court held that a grant of use and derivative use immunity "imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* at 460, 92 S.Ct. at 1665.

26. 18 U.S.C. § 6002 (1970).

cise his " 'prerogative . . . not to take the stand in his own prosecution . . . .' "[27]

B. *Appellant.* Since Liddy's conviction on the Watergate grand jury's indictment is still pending on appeal, he may be retried on that indictment. Liddy contends that it is therefore inappropriate for the grand jury to compel him to testify on matters that may arise during his possible retrial.

C. *Target or Potential Defendant.* Given "the assertions of the Government that he was the 'arch conspirator and boss' of the criminal transactions which have been, and are still under investigation by the grand jury,"[28] Liddy argues that he is a target of the grand jury's investigation and as such cannot be compelled to give possibly incriminating evidence about himself, even under a grant of immunity.

While we can discern nothing in section 6002 or *Kastigar* which suggests that these categories of witnesses are to be treated differently from "ordinary witnesses," we will nevertheless discuss each category separately and demonstrate that Liddy can derive no comfort from his self-categorizations.

A. *Liddy as Defendant*

■ While we think the analogy between a defendant standing trial and a "defendant" appearing before the grand jury is an imperfect one,[29] we recognize that there is respectable authority for the proposition that one who has been formally charged may not be called before the grand jury to testify about his alleged crimes unless he knowingly consents.[30] However, we need not decide whether we should lend our imprimatur

---

27. Brief for Appellant at 45, *quoting* 8 J. Wigmore, Evidence § 2251 (McNaughton rev. 1961).

28. Brief for Appellant at 44.

29. In United States v. Scully, 225 F.2d 113 (2d Cir.), cert. denied, 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955), the court stated:

Upon closer examination, however, it becomes apparent that the principle which underlies the rule that the defendant in a criminal trial may refrain even from being sworn as a witness, has no application to proceedings before a Grand Jury.

. . . "The purpose of the law [enabling defendants to testify at trial] was to make defendants competent witnesses, but at the same time preserve to them the right to remain silent without prejudice." Wolfson v. United States, 5 Cir., 1900, 101 F. 430, 436, certiorari denied, 1901, 180 U.S. 637, 21 S.Ct. 919, 45 L.Ed. 710. This led to the rule that a defendant may not be called as a witness by the prosecution, for if he were sworn and thus forced in open court to refuse to answer questions on the ground that the answers might incriminate him, the "option of refusal," to which Professor Wigmore alludes, would be diluted. It would be difficult thereafter to take effective steps to prevent a jury, charged with the responsibility of determining the guilt or innocence of the accused, from inferring guilt from the assertion of the constitutional privilege. The result thus arrived at avoids, as it should, any encroachment upon the rights guaranteed by the Fifth

Amendment. See Wolfson v. United States, supra.

These considerations do not apply to the inquisitorial proceedings of a Grand Jury. Such a body is not charged with the duty of deciding innocence or guilt and, for this reason, its proceedings have never been conducted with the assiduous regard for the preservation of procedural safeguards which normally attends the ultimate trial of the issues. Thus, in such proceedings, there is no right to counsel, no right of confrontation, no right to cross-examine or to introduce evidence in rebuttal and ordinarily no requirement that the evidence introduced be only such as would be admissible upon a trial.

225 F.2d at 115–116 (footnote omitted). Other cases in which courts have recognized the distinction between a defendant at trial and an accused before the accusing grand jury include United States v. Cleary, 265 F.2d 459, 460–461 (2d Cir.), cert. denied, 360 U.S. 936, 79 S.Ct. 1458, 3 L.Ed.2d 1548 (1959); In re Certain Proceedings Before the 1959 Grand Jury, 212 F.Supp. 823, 826 (N.D. Ill.1963).

30. *See* Jones v. United States, 119 U.S.App. D.C. 284, 289, 342 F.2d 863, 868 (1964) (*en banc*) (Edgerton, Bazelon, Fahy, Wright, JJ., minority view); United States v. Lawn, 115 F.Supp. 674 (S.D.N.Y.1953); Meshbesher, Right to Counsel Before Grand Jury, 41 F.R.D. 189, 202 (1966); Note, Self Incrimination by Federal Grand Jury Witnesses: Uniform Protection Advocated, 67 Yale L.J.

to this proposition, for even if we were to do so, Liddy would not benefit thereby. Liddy is not in the position of one who has been indicted and, *before facing trial*, has been called to testify before the indicting grand jury. Rather, Liddy has been indicted *and convicted* for the crimes about which the grand jury now seeks his testimony.[31] The Second Circuit in United States v. Romero[32] analyzed the status of a grand jury witness in such a position as follows:

> It is well established that once a witness has been convicted for the transactions in question, he is *no longer able to claim the privilege of the Fifth Amendment and may be compelled to testify*.[33]

In Reina v. United States[34] the Supreme Court stated that this proposition is supported by "weighty authority" and cited *Romero* as one such authority.[35] Since Liddy "has been convicted for the transactions in question" (unlawful surveillance and break-in of the Watergate) "he is no longer able to claim the privilege" (with respect to grand jury questions regarding those transactions) "and may be compelled to testify." That Liddy has been granted use and derivative use immunity under section 6002 makes it even more difficult for us to accept his argument that as a defendant he could not be compelled to answer the grand jury's questions. Indeed, we reject that argument.

1271, 1274 (1958). In United States v. Lawn, *supra*, the District Court dismissed felony indictments returned against the defendants by a grand jury before which the defendants had been subpoenaed to testify while informations charging misdemeanors were pending against them. The court held:

. . . [A]n indictment is invalid if a defendant against whom a criminal information has been filed, is called by the prosecution as a witness before the grand jury to obtain evidence tending to sustain an indictment against him, which supersedes the earlier information.

115 F.Supp. at 677. While an appeal of this dismissal was pending, the Government instituted a new grand jury investigation, which resulted in the re-indictment of the defendants. Defendants appealed their subsequent convictions on the ground that the trial court had denied them due process by refusing to hold a hearing to determine whether any of the tainted testimony or evidence produced before the first grand jury, or evidence derived therefrom, had been used by the second grand jury. The Supreme Court held that the defendants were not entitled to such a hearing because 1) they had not laid a sufficient factual foundation to justify a protected hearing and 2) "an indictment returned by a legally constituted nonbiased grand jury . . . ., if valid on its face, is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment." Lawn v. United States, 355 U.S. 339, 349, 78 S.Ct. 311, 317, 2 L.Ed.2d 321 (1958). A minority of this court sitting *en banc* in Jones v. United States, *supra*, intimated that the Supreme Court's *Lawn* decision had "perhaps" implicitly approved the earlier District Court holding that "taking [an accused] before the grand jury without his con-

sent and asking him anything violates his privilege." 119 U.S.App.D.C. at 289, 342 F. 2d at 863. Liddy relies on this statement from *Jones* in his brief at 56. However, the Supreme Court in *Lawn* explicitly recognized that the District Court's dismissal of the first grand jury's indictments was a *final decision* that had not been upset on appeal. 355 U.S. at 348, 78 S.Ct. 311. Thus, the Court was precluded from questioning the merits of the District Court's earlier decision, and nothing in *Lawn* can be read as more than this.

31. For a discussion of the problems allegedly posed by the fact that Liddy's conviction is pending on appeal and that he may be retried in the event his conviction is reversed, see Part II. B. *infra*.

32. 249 F.2d 371 (1957).

33. *Id.* at 375.

34. 364 U.S. 507, 81 S.Ct. 260, 5 L.Ed.2d 249 (1960).

35. *Id.* at 513. Other cases lend direct support to the proposition stated in *Romero*. United States v. Johnson, 488 F.2d 1206, 1209 (1st Cir. 1973); United States v. Skolek, 474 F.2d 582, 585 (10th Cir. 1973); United States v. Mobley, 421 F.2d 345, 351 n. 5 (5th Cir. 1970); United States v. Hoffman, 385 F.2d 501, 504 (7th Cir. 1967), cert. denied, 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed. 2d 288 (1968); United States v. Tinney, 340 F.Supp. 1146, 1152 (E.D.Pa.1972), rev'd on other grounds, 473 F.2d 1085 (3d Cir.), cert. denied, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed. 2d 156 (1973). *See also* Hale v. Henkel, 201 U.S. 43, 67, 26 S.Ct. 370, 50 L.Ed. 652 (1906) ("[I]f the criminality has already been taken way, the Amendment ceases to apply."); Annot., 9 A.L.R.3d 990, 996 (1966).

## B. *Liddy as Appellant*

 Liddy argues that the grand jury cannot compel him to answer questions regarding the Watergate surveillance and break-in because if he is successful in the pending appeal of his conviction for Watergate crimes and the court orders him retried, his answers to the grand jury's questions might prejudice him on retrial. The short answer to this contention is that Liddy has been granted immunity under 18 U.S.C. § 6002, which ensures that if he is retried, the Government will be precluded from using his grand jury testimony or any evidence derived therefrom against him at retrial. This protection, as the Supreme Court held in *Kastigar,* is sufficient to supplant his Fifth Amendment privilege.[36]

Frank v. United States,[37] on which Liddy places much reliance, is of no help to his position. We did hold in that case that "the Government may not convict a person and then, pending his appeal, compel him to give self-accusatory testimony relating to the matter involved in the conviction."[38] However, our holding turned on the fact that the convicted defendant had appeared before the grand jury under a grant of *absolute, transactional immunity* conferred upon him pursuant to section 409(*l*) of the Federal Communications Act,[39] which has been superseded by the use and derivative use immunity provision of 18 U.S.C. § 6002. Section 409(*l*) provided that "no individual shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence . . . ." In *Frank* we held that this language necessitated dismissal of the indictment against the appellant, who had been compelled to testify about the crimes for which he had been convicted while his appeal of those convictions was pending. We reasoned that dismissal was necessary because otherwise one of two events could have occurred: 1) appellant's conviction could have been reversed and a retrial ordered, in which case the Government would have been prosecuting appellant "for or on account of [a] transaction . . . concerning which he [had been] compelled . . . to testify" or 2) appellant's conviction could have been affirmed, in which case he would have been "subjected to [a] penalty . . . for or on account of [a] transaction" about which he had testified. In either case, the proscription of the transactional immunity provision then in effect would have been violated.[40]

Conferral of transactional immunity on grand jury witnesses who claim their Fifth Amendment privilege not only is no longer required by statute, but has been held unnecessary under the Fifth

---

36. *See* notes 23–25 *supra* and accompanying text.

37. 120 U.S.App.D.C. 392, 347 F.2d 486 petition for cert. dismissed, 382 U.S. 923, 86 S.Ct. 317, 15 L.Ed.2d 338 (1965).

38. *Id.* 120 U.S.App.D.C. at 397, 347 F.2d at 491.

39. Act of 19 June 1934, ch. 652, § 409(i), 48 Stat. 1097, repealed. Act of 15 October 1970, Pub.L.No. 91–452, § 242, 84 Stat. 930.

40. The Supreme Court intimated disfavor with the *Frank* holding in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967) when, after citing *Frank,* it stated:

In relevant part, § 409(*l*) substantially repeats the language of the Compulsory Testimony Act of 1893, 27 Stat. 443, 49 U.S.C. § 46, which was Congress' response to this Court's statement that an immunity statute can supplant the Fifth Amendment privilege against self-incrimination only if it affords adequate protection from future prosecution or conviction. Counselman v. Hitchcock, 142 U.S. 547, 585–586 [12 S.Ct. 195, 35 L.Ed. 1110]. The statutory provision here involved was designed to provide such protection, see Brown v. United States, 359 U.S. 41, 45–46 [79 S.Ct. 539, 3 L.Ed.2d 609], *not to confer immunity from punishment pursuant to a prior prosecution and adjudication of guilt.* Cf. Reina v. United States, 364 U.S. 507, 513–514 [81 S.Ct. 260, 5 L.Ed.2d 249].

*Id.* 389 U.S. at 349 n. 3, 88 S.Ct. at 510 (emphasis supplied).

Amendment by the Supreme Court. In *Kastigar,* the Court stated:

> The privilege has never been construed to mean that one who invokes it cannot subsequently be prosecuted. Its sole concern is to afford protection against being "forced to give testimony leading to the infliction of 'penalties affixed to . . . criminal acts.'" Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.[41]

Thus, the immunity granted to Liddy under section 6002 gives him protection commensurate with his Fifth Amendment privilege without precluding further prosecution (in this case, retrial) for or on account of Watergate matters, about which he has been ordered to testify before the grand jury. Since our holding in *Frank* rested on application of a now defunct transactional immunity statute, it can have no relevance for Liddy's case.

Our analysis draws support from a 1972 decision by the Fifth Circuit, United States v. Kelly.[42] At issue in *Kelly* was a judgment of contempt that the District Court had entered against Kelly for refusing to answer grand jury questions regarding criminal acts for which he had been convicted. Kelly attacked the contempt judgment on the ground that the District Court's order of immunity [43] failed to protect him from retrial in the event his conviction was reversed on appeal. The Fifth Circuit originally accepted Kelly's argument and vacated the contempt judgment by an abbreviated order that was to be explained in a subsequent opinion. Before the court could issue its opinion, however, the Supreme Court decided *Kastigar.* The Fifth Circuit then vacated its original order and reinstated the contempt judgment against Kelly. The court explained that after *Kastigar* a witness need not be protected from retrial for the crimes about which he has been ordered to testify before the grand jury. Therefore, the court stated, "the immunity order issued by the district court . . . was, under *Kastigar,* sufficient to protect Kelly's Fifth Amendment privilege." [44] In so holding, the court explicitly refused to follow the *Frank* decision.[45] We can conclude only that the immunity conferred upon Liddy was sufficient to supplant his Fifth Amendment privilege notwithstanding his status as a convicted defendant whose appeal was pending.

### C. Liddy as Target or Potential Defendant

■ Liddy asserts that as the recognized "arch conspirator" in the Watergate bugging and burglary,[46] he is a target of the grand jury's investigation. In this status, Liddy contends, the Fifth Amendment precludes the grand jury from compelling him to give testimony that might lead to his own indictment.

41. 406 U.S. at 453, 92 S.Ct. at 1661. (footnote omitted) (emphasis original).

42. 464 F.2d 709.

43. Pursuant to 18 U.S.C. § 2514 (1970), which has been repealed effective four years following the sixtieth day after enactment of Act of 15 October 1970, Pub.L.No.91–452, §§ 227(a), 260, 84 Stat. 930, 931.

44. 464 F.2d at 712. The court was careful to state:
> We emphasize, however, as the Supreme Court did in *Kastigar,* that the Fifth Amendment requires not only that the compelled testimony not be used against the witness but imposes a "total prohibition on use . . . barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosure." 92 S.Ct. 1664.
> *Id.* 464 F.2d at 712–713.

45. *Id.* at 713–714.

46. Liddy was so characterized by a Government prosecutor at the 26 March 1973 hearing on the Government's motion to grant Liddy immunity. H.T.(26) at 7, A.App. at 45.

As support for his position, Liddy cites the view expressed by four judges of this court sitting *en banc* in Jones v. United States: [47]

> At a trial, putting the accused on the witness stand without his consent and asking him anything at all would violate his constitutional privilege against self-incrimination. We think taking him before the grand jury without his consent and asking him anything violates his privilege.[48]

However, in the context of Liddy's case, we need not decide whether to endorse the *Jones* minority position [49] for even if we did, it would avail Liddy nothing.

47. 119 U.S.App.D.C. 284, 342 F.2d 863 (1964).

48. *Id.* 119 U.S.App.D.C. at 289, 342 F.2d at 868 (Edgerton, J., with whom Bazelon, C. J., Fahy and Wright, JJ., joined) (footnote omitted). In support of their position, the four judges cited the following language from Powell v. United States, 96 U.S.App.D.C. 367, 226 F.2d 269 (1955):

> "No doubt it would be a boon to prosecutors if they could summon before a Grand Jury a person against whom an indictment is being sought and there interrogate him, isolated from the protection of counsel and presiding judge and insulated from the critical observation of the public. But there is a serious question whether our jurisprudence, fortified by constitutional declaration, permits that procedure."

119 U.S.App.D.C. at 288, 342 F.2d at 867, *quoting* 96 U.S.App.D.C. at 372, 226 F.2d at 274. This language was dictum since the sentence immediately following it in *Powell* was, "However, in the view which we take of the case at bar, we do not reach this constitutional question, avoiding it as we should when it is possible to do so." 96 U.S.App. D.C. at 372, 226 F.2d at 274.

49. Four of the eleven judges who sat in *Jones* (Edgerton, Bazelon, Fahy, and Wright) adhered to this position, while four (Prettyman, Miller, Danaher, and Bastian) expressly rejected it. 119 U.S.App.D.C. at 301–303, 342 F.2d at 880–882. Judge Burger expressed general agreement with the Prettyman group's views. *Id.* at 314, 342 F.2d at 893. The holding of the court with respect to the legality of compelling the appellant to testify before the grand jury that subsequently indicted him was determined by the intermediate position of Judges McGowan and Washington. They stated that "the taking of this particular defendant before the grand jury, without his first having the benefit of consulation with counsel, was extraordinary in its disregard of *the realities of the situation, as well as of the customary practice.*" *Id.* at 294 n. 18, 342 F.2d at 873 n. 18. Two aspects of this analysis should be noted: 1) it does not suggest that taking a target defendant before the grand jury violates his Fifth Amendment privilege, but only that it ignores "the realities of the situation, as well as the customary practice;" 2) the analysis rests in part on the failure of the Government to give appellant's counsel advance notice of his client's impending grand jury appearance. The latter is significant because Liddy's counsel was available for consultation outside the grand jury room at all times during Liddy's grand jury appearances on 26 and 30 March.

Judges McGowan and Washington refused to accept the remedy proposed by Judges Edgerton, et al., who advocated dismissing appellant's indictment. Rather, they suggested that the case be remanded for a hearing at which the District Court was "to inform itself fully and accurately as to what the evidence was upon which the indictment can be said to have rested, and then to decide whether there was a foundation for it apart from that supplied solely by means of the defendant's personal appearance before the grand jury." *Ibid.* The effect of this approach is that if the Government calls a target or potential defendant to testify before a grand jury, the grand jury can then indict him only on the basis of evidence other than that supplied by his testimony. This, in effect, is a rule of automatic use immunity such as that formally conferred upon Liddy for his grand jury appearance. *See also* People v. Laino, 10 N.Y. 2d 161, 176 N.E.2d 571, 218 N.Y.S.2d 647 (1961); People v. Leto, 70 Misc.2d 218, 334 N.Y.S.2d 303 (Albany Cty.Ct.1972). The McGowan-Washington result became the holding in *Jones* when the Edgerton group joined in it as a means of assembling a majority for one disposition. Thus, even assuming Liddy was a target or potential defendant before the Watergate grand jury, that he was granted use and derivative use immunity and had counsel available for consultation satisfied any requirements established by the holding in *Jones*.

It should further be noted that the court's action in *Jones* was predicated upon the court's supervisory powers over the administration of criminal justice in the District of Columbia. The court may have taken this route in recognition of the Supreme Court decisions suggesting that a grand jury may return a valid indictment even though it has received unconstitutionally obtained evidence or evidence that would be inadmissible at trial under basic rules of evidence. *See* United

In *Jones* the appellant had already given the police a confession[50] by the time he appeared before the grand jury, so it was inevitable that the grand jury would indict him. Subsequently, he was in fact indicted (and convicted) for the crimes about which the grand jury had questioned him. The four-judge minority of this court expressed the view quoted above and advocated that appellant's indictment be dismissed as a consequence. Liddy's position is obviously different from that of the appellant in *Jones*. First, the grand jury has not returned an indictment against Liddy in the time since his appearance before it. Thus, the main reason the minority in *Jones* concluded that compelling the appellant to appear before the grand jury violated his Fifth Amendment privilege is absent in the case at bar. Moreover, the remedy proposed by the minority in *Jones*, dismissal of appellant's possibly tainted indictment, is obviously inapplicable here. Second, there is no indication that at the time Liddy was called to testify, the grand jury intended to indict him for the crimes about which he was questioned, nor is there any evidence that it now so intends. So Liddy is not manifestly or even arguably the target of the grand jury's investigation as the appellant was in *Jones*. Indeed, Government prosecutors expressly disclaimed any interest in indicting Liddy for Watergate crimes at the hearings on the Government's motion to grant immunity.[51] Our faith in these disclaimers is enhanced by the fact that Liddy has already been tried and convicted under three different criminal statutes for his actions in connection with the Watergate surveillance and break-in.[52]

Liddy's position vis-à-vis the Watergate grand jury is more like that of the appellant in Goldberg v. United States.[53] After Goldberg had been arrested and arraigned for possession of stolen treasury bills, he was called before a grand jury and questioned about his alleged crimes and the possible involvement of others in the treasury bill transactions. He asserted his Fifth Amendment privilege and refused to answer. The District Court granted him immunity under 18 U.S.C. § 6002 and ordered him to testify, but he persisted in asserting his privilege. Consequently the court found him guilty of civil contempt and ordered him confined pursuant to 28 U.S.C. § 1826. On appeal Goldberg argued that the compulsory immunity provision of section 6002 was not intended to apply to a "person who was already the subject of a criminal complaint for the transaction into which the grand jury was inquiring . . . ."[54] If it was so intended, he argued, it is unconstitutional despite the Supreme Court's holding in *Kastigar*. The Second Circuit affirmed Goldberg's contempt conviction. The court held that Goldberg could be compelled to testify under a grant of section

States v. Blue, 384 U.S. 251, 255 & n. 3, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); Lawn v. United States, 355 U.S. 339, 349–350, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); Note, 67 Yale L.J. *supra*, note 30, at 1282–83. *But see* Goldberg v. United States, 472 F.2d 513, 516 n. 4 (2d Cir. 1973).

50. This confession was held inadmissible because it was obtained in violation of Fed.R. Crim.P. 40(b), and appellant's conviction, as well as that of his co-defendant, was reversed.

51. H.T.(26) at 6, A.App. at 44; H.T.(30) at 12–13, A.App. at 76–77. The Government renewed these disclaimers in this court. Brief for the United States at 9–10.

52. There is respectable authority suggesting that this may make it constitutionally impermissible further to prosecute Liddy for Watergate crimes. *See* Ashe v. Swenson, 397 U.S. 436, 448, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring, joined by Black and Douglas, JJ.).

53. 472 F.2d 513 (2d Cir. 1973).

54. *Id.* at 515. Note that Goldberg's position was stronger than Liddy's since a criminal complaint charging him with crimes into which the grand jury was inquiring was still pending when he was called before the grand jury. In contrast, Liddy had already been convicted and sentenced for Watergate crimes when the grand jury summoned him.

6002 immunity and rejected his argument to the contrary as follows:

> The wording of the statutory provisions contains no suggestion of a limitation of the kind advanced by appellant; although he points to the word "witness" in § 6002, it seems clear that this includes a witness before the grand jury, which Goldberg surely is, *even if he is also a potential defendant at a later trial.*[55]

The court further held that Goldberg could not escape from the holding in *Kastigar* that use and derivative use immunity effectively eliminates any risk that a witness' compelled testimony may be used against him at some future trial. Finally, the court stated:

> We would be greatly troubled by what has happened here if the Government were seeking an indictment of Goldberg from the grand jury before which he is being asked to testify. . . . But *the Government represented to us in open court that the grand jury before which Goldberg has been directed to answer questions will not be asked to indict him.*[56]

The parallels between Goldberg's and Liddy's positions are obvious, and the *Goldberg* decision is therefore strong authority for the result we reach here.

Excluding "potential" defendants from the ambit of the immunity statute would undercut one of the primary functions of witness immunity: compelling persons suspected of criminal activity to yield information that will aid the grand jury in its investigation of such activity. As the Supreme Court stated in *Kastigar:*

> The existence of [immunity] statutes reflects the importance of testimony, and the fact that many offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime.[57]

The court in *Goldberg* pointed out that the legislative history of section 6002 reflects Congress' intention that the provision be employed by law enforcement agencies to obtain the testimony of the "agents" involved in a crime in order to discover and prosecute the "principal." [58] It is hardly surprising, then, that the weight of authority holds that a target or potential defendant may be compelled to testify before the grand jury investigating his alleged crimes.[59]

We have concluded that even if Liddy could be categorized as a target or potential defendant before the grand jury, which is dubious, the District Court's order to testify and subsequent

---

55. *Ibid.* (emphasis supplied).

56. *Id.* at 516 (emphasis supplied).

57. 406 U.S. at 446, 92 S.Ct. at 1656. *See also* United States v. Sweig, 441 F.2d 114, 121 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971) ; Note, 67 Yale L.J., *supra* note 30, at 1277–78.

58. 472 F.2d at 515, *citing* Hearings on H.R. 11157 and H.R. 12041 Before Subcomm. No. 3 of the House Comm. on the Judiciary, 91st Cong., 1st Sess. 42 (1970).

59. United States v. Friedman, 445 F.2d 1076, 1088 (9th Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971) ; United States v. Sweig, 441 F.2d 114, 121 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971) ; Cardarella v. United States, 375 F.2d 222 (8th Cir.), cert. denied, 389 U.S. 882, 88 S.Ct. 129, 19 L.Ed.2d 176 (1967) ; Kitchell v. United States, 354 F.2d 715, 720 (1st Cir. 1965), cert. denied, 384 U.S. 1011, 86 S.Ct. 1970, 16 L.Ed.2d 1032

(1966) ; United States v. Winter, 348 F.2d 204 (2d Cir.), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965) ; United States v. Cefalu, 338 F.2d 582, 583–584 (7th Cir. 1964) ; United States v. Cleary, 265 F.2d 459 (2d Cir.), cert. denied, 360 U.S. 936, 79 S.Ct. 1458, 3 L.Ed.2d 1548 (1959) ; United States v. Scully, 225 F.2d 113 (2d Cir.), cert. denied, 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955). *See also* Grunewald v. United States, 353 U.S. 391, 423, 77 S.Ct. 91, 1 L.Ed.2d 74 (1957) ; Meshbesher, *supra* note 30, 41 F.R.D. at 202; Comment, The Grand Jury Witness' Privilege Against Self-Incrimination, 62 Nw.U.L.Rev. 207, 223–24 (1967).
Note here that we are not compelled to decide what action we might take were Liddy to comply with the District Court order to testify before the 5 June 1972 grand jury and were that grand jury subsequently to indict him for crimes related to his testimony. *See* notes 49–51 *supra* and accompanying text and text accompanying note 56 *supra.*

# 1306

contempt judgment would have to be affirmed.[60]

## III. CONCLUSION

For the reasons stated herein, the judgment of contempt against Liddy under 28 U.S.C. § 1826 is

Affirmed.

---

**60.** Liddy further argues that the first clause of the Fifth Amendment, "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment, of a grand jury . . . . , protects him from being "held to answer" before the grand jury in the absence of an indictment against him. However, the phrase "held to answer" in the Fifth Amendment clearly means "brought to trial" or "prosecuted." The Supreme Court in Ex parte Wilson, 114 U.S. 417, 5 S.Ct. 935, 29 L.Ed. 89 (1885), interpreted the indictment clause of the Fifth Amendment as follows:

> When the accused is in danger of being subjected to an infamous punishment if convicted, he has a right to insist that he shall not *be put upon his trial,* except on the accusation of a grand jury.

*Id.* at 426, 5 S.Ct. at 939 (emphasis supplied). Moreover, grand jury investigations would be thwarted if a witness could not be called until he had been indicted. *See* United States v. Dionisio, 410 U.S. 1, 15–16, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); United States v. Mara, 410 U.S. 19, 48, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (Marshall, J., dissenting); Hale v. Henkel, 201 U.S. 43, 65, 26 S.Ct. 370, 50 L.Ed. 652 (1906).