In Re UNITED STATES of America,

v.

Jane KEMBER and Morris Budlong, Mary Sue Hubbard, Henning Heldt, Richard Weigand, and Gregory Willardson, Appellants.

Nos. 80–2329 to 80–2332.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 19, 1980.

Decided Nov. 24, 1980.

Leonard B. Boudin, New York City, with whom Michael Lee Hertzberg, Roger E. Zuckerman, Roger C. Spaeder, Washington, D. C., Philip J. Hirschkop, and Leonard S. Rubenstein, Alexandria, Va., were on the brief, for appellants.

Judith Hetherton, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C.

Ruff, U. S. Atty., John A. Terry, Raymond Banoun, and Katherine Winfree, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before McGOWAN, EDWARDS and GINSBURG, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

Appellants, subpoenaed by the prosecution to testify in a criminal trial currently in progress in the District Court and granted use immunity for that purpose, refused to testify and were held by the District Court to be in civil contempt. They appeal that judgment and challenge its validity on a number of grounds. For the reasons hereinafter appearing, we find none of their contentions to be availing, and we affirm.

## I

On August 15, 1978, an indictment was returned charging appellants (Hubbard, Heldt, Weigand, and Willardson) and seven other persons, including the defendants in the current criminal case (Kember and Budlong), with a number of federal and D.C. Code offenses. The latter consisted of ten counts of burglary, which were charged against both appellants and Kember and Budlong. On the same day warrants were issued for the arrest of Kember and Budlong, who were in England, and the United States promptly requested the United Kingdom to extradite them.

On October 26, 1979, appellants were convicted in a non-jury trial on stipulated evidence of one count of conspiring to obstruct justice (a federal offense). The presiding judge also enforced an asserted agreement under which the appellants, convicted of the one count, were to have all the other counts against them in the indictment dismissed if the conviction was not reversed on appeal; if, contrarily, the conviction was reversed, the prosecution could proceed on any of the remaining offenses charged in the indictment. On December 6, 1979, appellants were sentenced to prison terms and fined. Since December 21, 1979, they have been at liberty on bail pending appeal.

On March 13, 1980, the extradition proceedings against Kember and Budlong were at long last completed after traversing the entire English judicial hierarchy from Bow Street Magistrate to the House of Lords (with a further futile application to the Home Secretary and the European Commission of Human Rights), and they were returned to the United States and arraigned before a federal magistrate in Washington, D. C. The Government represented to the magistrate that, under the terms of the British extradition order, Kember and Budlong could be prosecuted only on the D.C. Code offenses joined in the indictment, i. e., the burglary counts. Their trial on these counts began in the District Court on October 27, 1980.

In anticipation of that trial, the Government subpoenaed the appellants to appear and to testify. A joint motion by appellants to quash the subpoenas was denied by the District Court on October 21, 1980—on the eve of trial. At the trial itself, appellants were called as the prosecution's first four witnesses. After stating their names, they declined to answer all other questions put to them, claiming their privilege against self-incrimination under the Fifth Amendment, as well as rights under the First, Fourth, and Sixth Amendments; they also urged that the court lacked jurisdiction to enforce the subpoenas. They were then granted immunity against use of their testimony under 18 U.S.C. §§ 6001 et seq., and were directed by the court to respond to the questions, but they refused to do so. After a *voir dire* hearing outside the presence of the jury, in which appellants renewed their earlier objections, the court made its contempt adjudication, but released appellants on their personal recognizance pending appellate review of the court's action.

## II

On appeal to this court, appellants have not pressed further any claim deriving from the First Amendment. They have, however, continued to urge that, since the Dis-

trict Court was called upon to try Kember and Budlong only for the D.C.Code offenses of burglary, as distinct from the U.S.Code crimes charged in the indictment, it lacked jurisdiction to proceed against the defendants. If such jurisdiction is wanting, appellants say, then the subpoenas for their appearance as witnesses must be quashed.

It is further argued on appeal that compelling the testimony of appellants constitutes (1) a denial of the privilege against self-incrimination guaranteed them by the Fifth Amendment, and (2) a violation of their right to effective assistance of counsel under the Sixth Amendment. Related to their latter contention is an insistence that, as potential trial defendants under the other criminal charges in the continuing indictment, they are unlawfully being deposed in violation of 18 U.S.C. § 3503(d) and Rules 15 and 16 of the Federal Rules of Criminal Procedure.

They also assert that the Fourth Amendment prohibits their interrogation because it would be based on illegally seized evidence. Further, they claim that the District Court failed to take the steps necessary to assure that they were not questioned by reference to information flowing from illegal electronic surveillance by the Government. In addition, they attack the validity of the immunity grant based upon assertions that (1) the guidelines in the *United States Attorneys' Manual* were not observed, (2) no showing of necessity for the testimony was made, (3) compelling Hubbard's testimony would contravene a disposition agreement entered with the Government, and (4) the immunity statute has been discriminatorily employed. Finally, appellants complain of the District Court's denial of their request for a hearing on the question whether the subpoenas were issued in the exercise of good faith by the prosecution.

Part III of this opinion will address the subject of the District Court's jurisdiction; Part IV will deal with the Fifth and Sixth Amendment contentions, including the deposition argument; and Part V will speak to the Fourth Amendment and all of the remaining points.

### III

Appellants assert that the District Court lacks jurisdiction to try Kember and Budlong for the purely local offenses currently before the court. Therefore, appellants urge, the court lacked power to compel their testimony and cite them for contempt. Appellants acknowledge that D.C.Code § 11–502(3) (1973) allows the U. S. District Court to try local D. C. offenses if those offenses are "joined in the information or indictment with any Federal offense" and that the original indictment against Kember and Budlong charged both federal and local offenses. Since Kember and Budlong were extradited and arraigned only on local charges, however, appellants contend that the District Court lost jurisdiction to try the case and was therefore without power to hold them in contempt for refusing to testify in response to the Government's subpoenas.[1]

The word jurisdiction is popular in the lexicon of lawyers and judges, so popular that its chameleon quality sometimes slips from our grasp.[2] But cases like the one before us force attention to the manifold

---

1. This is not the first time that a court has been asked to consider the power of the District Court to try Kember and Budlong. Defendants Kember and Budlong moved, prior to the start of their trial, to divest the federal court of jurisdiction. The District Court denied that motion, finding that federal and local counts had been properly joined in the original indictment and that, since the court had already invested substantial time in the case and the prosecution involved significant federal interests, the United Kingdom's failure to extradite Kember and Budlong on any federal offenses should not impair the court's jurisdiction. *United States v. Kember*, 487 F.Supp. 1340 (D.D.C.1980). Kember and Budlong appealed the denial of their motion and also petitioned this court for writs of mandamus and prohibition. This court dismissed the interlocutory appeal and denied the petition. *In re Kember*, No. 80–1542 (D.C.Cir. June 17, 1980).

2. *See generally* Smit, *International Civil Procedure—A Selective Discussion*, 10 Am.J. Comp.L. 164 (1961).

settings in which we employ the term, and remind us that its meaning frequently can be determined only from context. In their briefs and at oral argument, appellants have given first place to their jurisdiction argument. That is understandable in view of the almost automatic association of the word jurisdiction with the adjectives "basic," "fundamental," "essential." If one steps out of the fog law books and judicial decisions sometimes generate, however, it should be apparent that the jurisdictional question tendered here is not a question of jurisdiction writ large. Indeed, of all the objections appellants raise to the order compelling their testimony, the issue labeled jurisdiction may have the least substance in terms of the fairness and reasonableness of the Government demand they resist.

Appellants assert that the case in which they are called upon to testify belongs in the courthouse across the street. They do not suggest that proceedings there would be in any respect fairer or more sensitive to their concerns. They recognize that both courts, the U. S. District Court and the D. C. Superior Court, were established by the same sovereign and that prior to 1970, the

U. S. District Court had exclusive jurisdiction over prosecutions of the kind here involved.[3] Because indiscriminate use of the term jurisdiction is inveterate in the profession, appellants cannot be faulted for characterizing the question as they do. Nonetheless, the flaw they assert entails at most jurisdiction writ small.

Jurisdiction is indeed basic when the word is used to mean the legislative, executive or judicial power of the United States or, in our federal system, a state of the United States. Legislative jurisdiction refers to the power of a political entity to enact and apply laws to a given person, thing or occurrence. Executive jurisdiction refers to the power to take administrative action in regard to a given person, thing or occurrence. Judicial jurisdiction denotes the political entity's power to subject a given person, thing or occurrence to its judicial processes.[4] There is in this case no absence of jurisdiction in any of these basic meanings. Congress has the undisputed power under the Constitution[5] to define the crimes involved in the pending prosecution, the U. S. Attorney's Office has undisputed authority to conduct the prosecution, and

---

**3.** Felonies in violation of the D.C.Code were tried exclusively in the U. S. District Court until 1970. *See Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). In that year, Congress passed the District of Columbia Court Reform and Criminal Procedure Act, Pub.L.No.91–358, tit. I, 84 Stat. 473, 475 (1970) (codified at D.C.Code § 11–101 *et seq.* (1973)), shifting general jurisdiction over D.C.Code offenses to the D. C. Superior Court. "Violations of the District of Columbia Code and violations of the United States Code are all crimes against a single sovereign, namely, the United States. All crimes prosecuted under the District of Columbia Code are maintained in the name of the United States. ... The [Court Reform] Act did not vitiate the essential character of the District of Columbia as an arm of the sovereign United States." *Goode v. Markley*, 603 F.2d 973, 976 (D.C.Cir.1979) (citations omitted), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980).

As appellants acknowledge, Joint Brief for Appellants at 9, the Court Reform Act was intended to lessen the U. S. District Court caseload burden. "A central purpose and policy of the D. C. court reorganization was to assure that the prompt and effective discharge of [the great and growing responsibilities of the Dis-

trict Court with respect to matters of federal concern] would not be impeded by the necessity of trying local criminal offenses ...." *United States v. Jackson*, 562 F.2d 789, 800 (D.C. Cir.1977).

**4.** *See* M. Rosenberg, J. Weinstein, H. Smit & H. Korn, Elements of Civil Procedure 206 (3d ed. 1976).

Adjudication by a federal court when the United States lacks judicial jurisdiction would violate the due process clause of the Fifth Amendment. Similarly, adjudication by a state court when the state lacks judicial jurisdiction would violate the due process clause of the Fourteenth Amendment. *See* Restatement (Second) of Conflict of Laws, Introductory Note to Ch. 3, at 100 (1969). The critical inquiry is whether the subject of the litigation has a relationship to the nation or state adequate to make it fair and reasonable for the United States or the state of the United States to exercise authority over the matter through its courts. *See id.* at 100–01.

**5.** U.S.Const. Art. I, § 8, cl. 17 (plenary power of Congress to enact legislation for the District of Columbia).

the United States (Congress), beyond doubt, has power to commit the case to adjudication in a court of its creation. Jurisdiction writ large, therefore, plainly exists in this case.

Nor does the case present any collision of regulatory or prosecutorial interests between different sovereigns. The conduct to which the indictment relates is of unique concern to the United States.[6] No foreign nation and no state of the United States has a comparable, if indeed any, stake in controlling or proscribing the particular activities that constitute the subject matter of the charges against the defendants.[7]

While this case does not concern legislative, executive, or judicial jurisdiction, it does raise an issue of statutory jurisdiction. Although Congress could have empowered the U. S. District Court to try this case, appellants contend it elected to withhold that power. We turn, therefore, to D.C. Code § 11–502(3), the provision governing U. S. District Court authority over D.C. Code offenses.

█ Section 11–502(3) empowers the U. S. District Court for the District of Columbia to try a local criminal offense if the offense "is joined in the same information or indictment with any Federal offense." As this court stated in *United States v.*

*Shepard*, 515 F.2d 1324, 1329 (D.C.Cir.1975), this language is "unequivocal."[8] We believe that, so long as an indictment properly joins federal and local offenses under Fed. R.Crim.P. 8, *see United States v. Jackson*, 562 F.2d 789, 793 (D.C.Cir.1977),[9] Congress intended to give the federal court power to try the local offense. The statute does not suggest that any disposition of the federal offense, subsequent to proper joinder in an indictment, withdraws power over the local offense.

As the Supreme Court stated in *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), however, "power need not be exercised in every case in which it is found to exist." In that case the Court ruled that a federal court has power to hear a state civil claim whenever that claim is joined to a federal claim of substance against the same defendant, and the claims so joined derive from a "common nucleus of operative fact." *Id.* at 725, 86 S.Ct. at 1138. The Court then emphasized that federal courts should decline to exercise that power if it opposes "considerations of judicial economy, convenience and fairness to litigants." *Id.* at 726, 86 S.Ct. at 1139. In the context of federal pendent jurisdiction over state civil claims, therefore, the Supreme Court's analysis

**6.** The charges in the pending prosecution involve burglaries alleged to have been committed with the intent to steal property of the United States Government.

**7.** Appellants do not suggest that the United Kingdom's extradition decision was affected in any way by consideration whether the trial would occur in the U. S. District Court or the D. C. Superior Court.

**8.** *Shepard* was the first case in which this court construed D.C.Code § 11–502(3). There, the indictment joined several D.C. offenses with a single federal offense. Just before submitting the case to the jury, the Government dismissed the federal charge because of discrepancies in the indictment. The court held that since the offenses were properly joined in the original indictment and trial was nearing conclusion, the court retained jurisdiction to conclude trial of the D.C.Code offenses.

**9.** *Jackson* was the second, and most recent, occasion on which this court addressed the meaning of D.C.Code § 11–502(3). In *Jackson*

the District Court severed local and federal counts before trial in order to avoid prejudice to the defendants. The defendants appealed from their convictions on the D. C. charges, claiming that the District Court had no power to try those offenses. This court agreed, resting its holding on two grounds. The first basis for the holding in *Jackson* was, under Fed.R. Crim.P. 8, that the federal and local counts were improperly joined in the indictment. The court concluded that Congress could not have intended to empower the federal courts to try D. C. offenses unless those offenses were *properly* joined in the indictment.

Alternatively, the *Jackson* court held that when the District Court severed the federal and local counts prior to trial, the court lost jurisdiction to try the local offenses. As we explain *infra*, we agree that the court should not have proceeded to try the local offenses under those circumstances, but we would not have rested this alternate holding in *Jackson* on jurisdictional grounds.

clearly distinguishes the question of power to adjudicate from the separate and subsequent question, is that power appropriately exercised in the circumstances the particular case presents.

We believe that D.C.Code § 11–502(3) calls for a similar distinction. While Congress conferred power on the U. S. District Court to try local offenses whenever those offenses are properly joined with a federal offense, Congress did not instruct the federal forum to exercise that power without regard to the exigencies of the particular case. As this court noted in *Jackson*, 562 F.2d at 799, Congress probably did not "consciously confront" the problems that would arise when a federal charge, properly joined in the indictment to local charges, faded from the case before trial. Courts, however, should be sensitive to those problems. Just as a federal court asked to exercise pendent jurisdiction over a state civil claim should decline to do so if the federal claims have been dismissed before trial, *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139, the U. S. District Court for the District of Columbia should decline to try local offenses when those offenses have been disassociated from any federal charges prior to trial and retention of the case would not comport with "[t]he responsibilities of the District Court with respect to matters of federal concern." *Jackson*, 562 F.2d at 800. We underscore, however, that this is a matter of sound exercise of the court's discretion, not a question of its power. Just as the question of power over a pendent state claim "will ordinarily be resolved on the pleadings," *Gibbs*, 383 U.S. at 727, 86 S.Ct. at 1139, the

power of the U. S. District Court to try D.C.Code offenses will ordinarily be resolved by the indictment.

We are aware that neither the court in *Shepard* nor the court in *Jackson* distinguished between the existence of power under D.C.Code § 11–502(3) and the discretionary exercise of that power. Our distinction, however, conflicts with the holding of neither case. In *Jackson* the court ruled that the federal and local counts were improperly joined in the original indictment. Plainly, therefore, the court lacked statutory jurisdiction to try the local offenses. Alternatively, the court held that since the federal and local offenses were severed before jeopardy attached, the District Court lost jurisdiction over the local offenses. Under our reading of D.C.Code § 11–502(3), the District Court did not on that account lose power over the local charges, but it abused its discretion by retaining the case.[10] And in *Shepard* the court ruled only that when a federal charge is dismissed after the trial is well under way the District Court retains jurisdiction to try local offenses properly joined with the federal charge in the original indictment. We agree that when the *Shepard* pattern is presented, the court should not relinquish its power over the case.[11]

 *Shepard* and · *Jackson* were clear cases; those panels had no need to distinguish between the possession of power under D.C.Code § 11–502(3) and the discretionary exercise of that power. We, however, deal with a novel situation. Witnesses, not defendants, appear before us requesting a ruling that would halt the prose-

---

10. The *Jackson* majority noted that prior to severance the federal court had invested almost no time in treatment of the local charges and that the local charges did not implicate federal law in any way. 562 F.2d at 800. The court, on the other hand, had a congressionally sanctioned interest in preserving the federal forum for "prompt and effective" resolution of federal controversies. *Id.* Under those circumstances, the District Court surely abused its discretion by proceeding to trial on the D.C. charges. Based on similar considerations, with respect to pendent civil jurisdiction, the Supreme Court has stated that dismissal of all federal claims before trial should "[c]ertainly" lead to dismiss-

al of the pendent state claims. *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139.

11. Once trial has begun, the court, prosecutor, and defendants have invested energy in the federal case. For this reason, a court ordinarily acts within its discretion when it retains jurisdiction over local charges to which jeopardy has already attached. Similarly, a federal court ordinarily does not abuse its discretion when federal civil claims drop from a case after the start of trial and the court proceeds with the pendent state claims. *Gibbs*, 383 U.S. at 726–27, 86 S.Ct. at 1139–40.

cution. We do not embrace the assertion made by the Government at oral argument that under no circumstances may a witness held in contempt for refusing to testify question a court's power to entertain the prosecution. We believe, however, that the power question is all the witness may raise.[12] The defendant, immediately at risk to a far greater extent, may raise in addition the separate, subsequent question, if the power to proceed exists, would exercise of that power in the setting presented constitute an abuse of discretion.[13]

The only jurisdictional question we confront in this case, therefore, is whether the local charges on which Kember and Budlong are standing trial were properly joined to any federal charge in the original indictment. The District Court has twice ruled that the charges in the indictment were properly joined.[14] We agree that "the offenses charged in the indictment ... allege the same series of acts or transactions within the requirements of Rule 8(b)." *United States v. Hubbard*, 474 F.Supp. 64, 87 (D.D.C.1979). Since federal and local offenses were properly joined in the original indictment, we hold that the District Court had the power to try Kember and Budlong and that, therefore, no jurisdictional barrier blocks the demand for appellants' testimony.

## IV

Appellants next argue that exaction of their testimony through use immunity and consequent coercive contempt violates both their Fifth Amendment privilege against self-incrimination and their Sixth Amendment right to the effective assistance of counsel. While linked considerations are raised, the two claims require different legal analyses and, accordingly, will be discussed separately.

### A. *Appellants' Privilege Against Self-Incrimination*

Appellants contend that the grant of use immunity pursuant to 18 U.S.C. § 6001 *et seq.* is insufficient to protect them against prosecution use of the testimony now sought to be extracted from them. Therefore, they claim, their continued refusal to testify is sheltered by the Fifth Amendment and is not contemptuous. They argue that, if their convictions on the federal conspiracy count are reversed on appeal, their testimony will be "available" to the prose-

---

**12.** While a witness may challenge a court's authority to compel his testimony and may assert testimonial privileges, we know of no case permitting a witness, on appeal from a contempt citation, to attack mere errors by the trial court. This is so even if, but for the trial court's error, the witness would not have been called to testify. For example, a witness may not claim that the trial court abused its discretion in finding that his testimony would be relevant and nonprejudicial. Nor may a witness challenge the court's failure to sever charges or defendants under Fed.R.Crim.P. 14, or the government's failure to accord the defendant a speedy trial. If witnesses could mount such attacks, parties could not control the unfolding of a case and our criminal justice system could not function to "secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." Fed.R.Crim.P. 2.

**13.** Our decision today, therefore, does not preclude defendants Kember and Budlong, if they are convicted, from claiming that the District Court abused its discretion by trying them on the wholly local offenses for which they were extradited. We express no opinion on that issue, noting only that the peculiar problems of extradition make this an atypical case.

**14.** The first occasion was *United States v. Hubbard*, 474 F.Supp. 64 (D.D.C.1979), where the court considered numerous pretrial motions by then defendants Hubbard, Heldt, Willardson, and Weigand. The second occasion was *United States v. Kember*, 487 F.Supp. 1340 (D.D.C. 1980), where the court rejected the motion of Kember and Budlong to divest the court of jurisdiction over the present case. Contrary to appellants' suggestion, the court's reliance in *Kember* on its earlier decision in *Hubbard* was not error. The proper joinder of offenses under Fed.R.Crim.P. 8, as opposed to the question of prejudice under Fed.R.Crim.P. 14, may be determined without regard to the particular defendants. The court's ruling on one occasion that the offenses were part of the same series of acts or transactions, therefore, was certainly relevant to its ruling on the same question on a second occasion. Appellants, moreover, did not present any developed argument before this court that the federal and local offenses were improperly joined in the original indictment.

cution and the presiding judge at a later trial on any of the other federal or D.C. Code charges on which they have been indicted. Further, even if their convictions are affirmed, they point to the prospect of further proceedings, such as a sentencing hearing or collateral review, in which the same dangers would arise.

The Government responds that the appellants' Fifth Amendment argument is premature. It relies upon the leading case in this area, *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), to support its position that judicial consideration of appellants' Fifth Amendment claims must abide occurrence of the further proceedings appellants now forecast or hypothesize. *Kastigar* held that use immunity did not violate the Fifth Amendment. Justice Powell, writing for the Court, reasoned that the rights of the use-immunized witness were protected because, in any later action against the witness, the Government would have to show that the evidence it presented was untainted by the immunized testimony. *Id.* at 460–62, 92 S.Ct. at 1664–66. Justice Powell termed this showing a "heavy burden." *Id.* at 461, 92 S.Ct. at 1665.

If the Government could show that its evidence had been derived wholly from sources other than the immunized testimony, the Court said, then the witness would stand in the very place he would have occupied had he not been granted immunity and, instead, relied upon the Fifth Amendment. Since the grant of use immunity is designed to place the witness in no worse, but no better, position than that of a non-immunized witness who refuses to testify, the Court thought that the hearing procedure it envisioned in *Kastigar* safeguarded the Fifth Amendment privilege. *Id.* at 453, 458–62, 92 S.Ct. at 1661, 1663–66.

The law in this circuit on witness immunity and the Fifth Amendment builds upon the prosecution's burden to show an absence of taint at any later proceeding. In 1974, this court, sitting *en banc*, decided that a convicted defendant, whose case was still pending on appeal, could nonetheless be compelled by a grant of use immunity to testify before a grand jury on issues which had some bearing upon his own culpability. *In re Liddy*, 506 F.2d 1293 (D.C.Cir.1974) *(en banc)*. This court reached that conclusion because the hearing requirement imposed by *Kastigar*, placing as it did the burden of proving a negative upon the Government, ensured that the Government would not be able to use Liddy's immunized testimony or any fruits thereof at any later proceeding. *Id.* at 1301.

Appellants place heavy reliance upon dictum in *Liddy*, in which this court reserved the question whether an *indicted* defendant, as opposed to a *convicted* one, could be compelled to testify in an incriminating fashion under a grant of use immunity. *See id.* at 1299–1300. Appellants say they belong in the indicted, not the convicted, defendant category. If their convictions on the conspiracy count are overturned, they assert, they will be subject to prosecution on the burglary charges now held in abeyance. In that event, they claim, their situation would be just like that of any other indicted defendant.

We think appellants' situation is closer to Liddy's than to that of the indicted defendant awaiting initial trial. For the latter, the probability that trial will occur is high. For these appellants, a second trial engagement is conjectural.[15] In another respect, these appellants range nearer to convicted defendants. The concern that the Government's real motive in compelling testimony under use immunity is to gather evidence against the witness is highest in the case of the *unindicted* witness.[16] If a prosecutorial

---

**15.** As to the specter of illegitimate use of their testimony in further proceedings involving their extant convictions, appellants' case is not even barely distinguishable from Liddy's.

**16.** In the case in which four members of this court discussed the Fifth Amendment concerns

such immunity grants raise, *Jones v. United States*, 342 F.2d 863, 868 (D.C.Cir.1963), those judges, in a section that did not represent the opinion of the court, concerned themselves with immunizing the testimony before a grand jury of an *unindicted* witness who was a target of that same grand jury. Surely the danger

evidence-gathering motive is a risk in the case of a witness facing initial trial following indictment, that risk is diminished when the witness, like these appellants or Liddy, cannot be further prosecuted if his present conviction stands.

The cases cited by appellants are not to the contrary. In cases such as *United States v. McDaniel*, 449 F.2d 832 (8th Cir. 1971), *cert. denied*, 405 U.S. 992, 92 S.Ct. 1264, 31 L.Ed.2d 460 (1972), the witness prevailed at the subsequent proceeding without an evidentiary hearing because, under the facts of those cases, there was no conceivable showing that the Government could make to prove an absence of taint. All of these cases involved circumstances in which use admittedly had been made of immunized testimony. Therefore, there was no set of facts the Government could possibly adduce to discharge its burden of showing a lack of taint. *See id.* at 838. In *McDaniel*, the same federal prosecutor who had seen defendant's immunized testimony was now prosecuting him. *Id.* at 835. In *United States v. Hinton*, 543 F.2d 1002, 1006–07 (2d Cir. 1976), the same grand jury that heard the defendant's immunized testimony indicted her. The identical situation arose in *United States v. Anzalone*, 555 F.2d 317, 319 (2d Cir.), *aff'd on rehearing*, 560 F.2d 492 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978). Where the taint has been established, there is no point in holding an evidentiary hearing on its existence *vel non.* In addition, these cases are distinguishable because they all involved witnesses who had testified objecting to use of their statements, not, as here, witnesses seeking to remain silent.

█ Based on our reading of *Kastigar* and *Liddy* we are constrained to conclude that the Government's ripeness argument must prevail. The *Kastigar*-style hearing to which appellants are entitled in any fur-

ther proceedings is a safeguard against violation of their Fifth Amendment right. We cannot extract from the authorities before us a conclusion that appellants are entitled to more.

B. *Appellant's Right to the Effective Assistance of Counsel*

█ Related to their concern that the prosecutor may use their immunized testimony in violation of their Fifth Amendment privilege, appellants forcefully argue that if the prosecutor is permitted to examine them now, their Sixth Amendment right to the effective assistance of counsel will be undermined. They fear revelation of the strategy they have worked out with their attorneys for use in any future proceedings directed against them. With a view to the possibility of a second trial should their convictions be reversed on appeal, they resist giving the Government a preview of their responses and their demeanor. They point out that their convictions were based on a stipulation and that, to date, they have never testified about the incidents involved in their prosecution.

Appellants claim that their situation is similar to that of defendants whose private communications with their attorneys were revealed to the Government. In *United States v. Levy*, 577 F.2d 200 (3d Cir. 1978), for example, the court held that such intrusion into the privacy of the attorney-client relationship warranted reversal of a conviction whether or not the informant's disclosure to the Government actually prejudiced the defendant. Judge Gibbons stated that "[w]here there is a knowing invasion of the attorney-client relationship and where confidential information is disclosed to the government," the Sixth Amendment is violated. The only effective remedy, the *Levy* court held, was to order dismissal of the indictment.[17]

---

that a witness was called primarily to fortify the case against him is far greater in that situation than in the one facing appellants.

**17.** This circuit has not ruled on the question presented in *Levy*—whether a defense based

on absence of prejudice is closed to the Government—and we do not decide that question today.

Disclosure to the Government, the Supreme Court has indicated, is critical to the success of a Sixth Amendment invasion of attorney-client relationship claim. In *Weatherford v. Bursey*, 429 U.S. 545, 555–56, 97 S.Ct. 837, 843–44, 51 L.Ed.2d 30 (1977), the Court said that an informer's intrusion into confidential lawyer-client communications, standing alone, does not constitute a violation of the Sixth Amendment. Communication to the Government, the Court ruled, was essential to establish that the constitutional right had been violated.

This case might be described as falling midway between *Levy* and *Weatherford.* Disclosure had occurred in *Levy*; the element of communication was absent in *Weatherford.* Here, appellants assert a risk of disclosure.

As in the case of appellants' Fifth Amendment challenge, we conclude that the claim of a Sixth Amendment violation is made too soon.[18] The testimony sought conceivably could provide clues to defense positions in later proceedings. But at this stage the matter lies in the realm of prediction. If appellants testify, the evidence they supply may furnish the Government with no insights into possible defense strategies beyond those that documents now in the Government's possession suggest. Nor would appellants be bound by any testimony they give in the Kember-Budlong prosecution. That testimony would not be admissible against them in any subsequent proceeding. The possibility that appellants may respond differently on another day further undercuts the Government's ability to divine later strategy from current testimony. Compounding uncertainty as to the viability of the Sixth Amendment argument, appellants may encounter no further trial. Under the disposition agreement, if appellants' extant convictions withstand appellate review, they will not be subject to prosecution on the charges now held in abeyance.

Additional factors support our refusal to hold that the risk of encroachment upon the attorney-client relationship warrants a stop order now. Unlike the situation in *Levy*, the Government is not intruding upon confidential communications between attorney and client.[19] It is seeking relevant, firsthand evidence for an ongoing prosecution. Nor can we attribute to the Government any manipulative tactic to secure the testimony of one confederate against another.[20] The separate trials of appellants and of defendants Kember and Budlong were caused by the length of the extradition process, a circumstance outside the control of the United States Attorney.[21]

18. We recognize that *Kastigar* did not address this issue. The Court in that case held a later hearing adequate to protect Fifth Amendment concerns. No Sixth Amendment concerns were aired by the Court.

19. Judicial concern over communication of confidential attorney-client conversations has been grounded in large part in the recognition that confidentiality is required to foster the candid exchange between attorney and client needed for a vigorous defense. *See Weatherford v. Bursey*, 429 U.S. 545, 563, 97 S.Ct. 837, 847, 51 L.Ed.2d 30 (1977) (Marshall, J., dissenting). We do not discern, in this case at least, any purported chilling effect of the compelled testimony on the relationship between attorney and client; instead, the argument appears to focus on the advantage accruing to the Government from its insight into the strategy of the defense.

20. The cases have indicated that, in choosing between a *per se* rule and some alternative in the area of effective representation, it is fair to look at the motives of the prosecution in bringing about certain events. *See Weatherford v. Bursey*, 429 U.S. 545, 557, 97 S.Ct. 837, 844, 51 L.Ed.2d 30 (1977). The Third Circuit in *Via v. Cliff*, 470 F.2d 271, 275 (3d Cir. 1972), and *United States v. Morrison*, 602 F.2d 529, 532 (3d Cir. 1979), *cert. granted on other grounds*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1135 (1980), has endorsed examination of the prosecution's motives in attempting to determine whether the Sixth Amendment has been violated.

21. Because our review reveals no basis for concluding that the purpose in calling for appellants' testimony is anything other than securing evidence against Kember and Budlong, we reject the contention that the subpoenas are substitutes for depositions forbidden under Fed.R. Crim.P. 15(d) and 16(b)(2) and 18 U.S.C. § 3503(d).

In summary, we are in no position to determine whether any defense strategy will be disclosed to the Government and decline to rule on the basis of speculation. At this juncture, we reject as premature appellants' contention that their Sixth Amendment right to the effective assistance of counsel has been violated. Our holding is narrow and tied to the special exigencies of this case. If the appellants were awaiting initial trial, or if the unique procedural posture of the case had been of the Government's design, we would be presented with different questions. Our disposition leaves it open to the appellants to renew their Sixth Amendment argument in subsequent proceedings should the facts then existing so warrant.

## V

Appellants have raised a series of additional points which they claim demonstrate that the contempt citations in this case are improper. We have carefully examined each of these arguments and find that they supply no substantial basis for reversing the decision of the District Court.

### A. *Claims Arising Under the Fourth Amendment*

Appellants contend that they are protected from being compelled to give testimony in this case by the Fourth Amendment. This argument is founded on the belief that appellants would be questioned on the basis of information obtained from evidence illegally seized by the Government. Appellants assert that the Government's case against Kember and Budlong rests largely on documents seized in two searches of Church of Scientology premises in Los Angeles, California on July 8, 1977.[22] Those searches were vigorously attacked by appellants in their own criminal case, and are currently the subject of an appeal pending

before this court. Assuming that the initial seizure of the documents was illegal, appellants assert that they have a right to object to any derivative use of those documents by the Government in a case in which they are called as witnesses. The Government argues in response that appellants may not assert this claim because defendants Kember and Budlong have been held to have no standing to challenge the searches in question.

We agree that appellants are not entitled to assert a Fourth Amendment claim in this proceeding. However, we rest our holding on reasoning different from that advanced by the Government.

■ In resolving this issue, it is critical to recognize that two separate questions may arise concerning a violation of a Fourth Amendment right of a "third party" indirectly involved in a criminal proceeding. The first and more common question concerns the extent to which a defendant has standing to object to the admission of evidence illegally seized from that third party. A second distinct question concerns the extent to which the third party may claim a protection under the Fourth Amendment when the Government proposes to use evidence against the defendant that has been illegally seized from the third party.

As to the first question, the Supreme Court has made clear in recent years that a defendant has no standing to object to the introduction of evidence illegally seized from a third party. *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). In this case, the District Court held that defendants Kember and Budlong did not have standing to challenge the searches here in question. Assuming this conclusion is proper, the Government is correct in ar-

---

22. Appellants also note that a separate search of Church of Scientology premises in the District of Columbia has already been declared unconstitutional. *In re Search Warrant*, Misc. No. 77–051 (D.D.C. April 24, 1979), *appeals pending*, Nos. 79–2138, 79–2176. It does not appear, however, that any documents seized in that search are being relied upon by the Government below. In any event, the discussion in this section is equally applicable to any questions that might be derived from information obtained in the District of Columbia search.

guing that, as a result, defendants have no standing to challenge the subpoenas in this case. This is so even though it may be asserted that the witnesses were found as a result of information obtained during illegal searches and even though the witnesses may be questioned about that information. As stated by the Government, to rule otherwise would grant defendants the right to achieve by indirect means something that the trial court has ruled they cannot do directly, namely, challenge the searches and suppress the evidence seized.

Accepting this argument of the Government, however, does not dispose of appellants' Fourth Amendment argument. Appellants here assert that their own Fourth Amendment rights protect them from being forced to testify in this case.[23] The question presented to us, therefore, focuses on the *extent* to which the Fourth Amendment protects an individual from unlawful seizures of evidence when that evidence will be used against some other party.

██ At the outset, it is fundamental that the Fourth Amendment protects all citizens, and not merely criminal defendants. As stated in *Weeks v. United States*, 232 U.S. 383, 391, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914):

> The effect of the Fourth Amendment is to put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws.

While this principle is undisputed, it does not resolve the question of what "remedies" are available to an individual whose Fourth Amendment rights have been violated. It is now established that such an individual is entitled to maintain a claim for damages against the officers who conducted the unlawful search. *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The individual may obtain the return of the illegally seized property. *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931). Perhaps most importantly, the individual may obtain exclusion of unlawfully seized evidence and its "fruits" from a trial in which he is a defendant. *Mapp v. Ohio*, 367 U.S. 643 (1961); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The question presented by this case is whether the individual may also block the use of evidence illegally seized from him[24] by refusing to testify concerning that evidence at a trial of some other party. For the reasons set forth below, we hold that an individual does not have such a right and may be compelled to testify.

We note that the questioning of appellants in this case does not separately violate the Fourth Amendment. As stated in *United States v. Calandra*, 414 U.S. 338, 354, 94 S.Ct. 613, 623, 38 L.Ed.2d 561 (1974):

> Questions based on illegally obtained evidence are only a derivative use of the product of a past unlawful search and seizure. They work no new Fourth Amendment wrong.

As a result, we are not dealing with a question of rights, but of remedies. In particular, we must decide whether appellants, during a criminal proceeding involv-

---

**23.** No allegation has been made in this case that appellants may not assert a Fourth Amendment violation because appellants lack standing to object to the searches in their own right. Since the matter has not been raised, we have no reason to decide that question. The sole issue we consider is whether appellants, assuming they have standing to object to the

searches in their own right, may also object to the searches in the trial of a third party in which appellants are witnesses.

**24.** For the purposes of this opinion, we assume, but do not decide, that the evidence may be deemed seized from the appellants. *See* note 23 *supra*.

ing another party, may invoke the exclusionary rule to bar the use (and derivative use) of evidence illegally seized from them.

The purpose of the exclusionary rule is not to redress the injury to the privacy of the victim unlawfully searched. As stated in *Linkletter v. Walker*, 381 U.S. 618, 637, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965):

> [T]he ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late.

Instead, the purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate the Fourth Amendment guarantee against unreasonable searches and seizures. *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960).

Based on these principles, the Supreme Court in *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), held that a witness before a grand jury could not invoke the exclusionary rule to bar questioning based on illegally seized evidence. In so doing, the Court described the scope of the exclusionary rule in a manner critical to the resolution of this case:

> [S]tanding to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search. This standing rule is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search.

414 U.S. at 348, 94 S.Ct. at 620 (citations omitted).

In stating that an individual only has "standing" to assert the exclusionary rule in a case in which the Government is attempting to impose criminal sanctions against that individual, *Calandra* resolves this case. The illegally seized evidence sought to be used here will not incriminate appellants, the alleged victims of the unlawful search, in this action. The evidence sought may only incriminate defendants Kember and Budlong. Nor can appellants claim that they have a right to assert the exclusionary rule because the Government is attempting to impose a sanction against them in the form of civil contempt. Appellants do not seek exclusion in their contempt proceeding, but rather in the criminal trial of defendants Kember and Budlong.

We recognize that the present case is not identical to *Calandra*. *Calandra* involved a subpoena issued by a grand jury, a legally "neutral" body that at least in theory is independent from the Government officers who conducted the illegal search. In the present case, the subpoenas were issued by a United States Attorney, who admittedly is not legally neutral, and is in fact responsible for the agents who committed the alleged unlawful seizures of the evidence. In *McSurely v. McClellan*, 521 F.2d 1024 (D.C.Cir.1975), this court suggested in dicta that the participation of Government agents in an unlawful search could prohibit *those agents* from using material unlawfully seized. In *McSurely*, this court, against the objection of a witness from whom the evidence was seized, upheld the right of a congressional committee to subpoena material unlawfully seized by *unrelated* state government officials. The court stated, however:

> As with the grand jury, the Congressional committee may not be privileged to utilize such information *if its agents have actively participated in the original unlawful seizure.*

521 F.2d at 1046 (emphasis supplied).

Nevertheless, we refuse to accept the implication that a *witness* may bar the United States Attorney in this case from using evidence that was illegally seized by "agents" of the United States Attorney. First, we note that the statement in *McSurely* is clearly dictum. Second, we believe that this dictum is at odds with the Supreme Court cases cited above, including *Calandra*, indicating that neither the witness from whom the evidence was illegally seized, nor the defendant, has standing to object to the use of the evidence *in a criminal proceeding involving only the defendant.* Third, we find that, pursuant to the

basic rationale of *Calandra*, this is not a situation where the exclusionary rule need apply.

Application of the exclusionary rule in this situation would clearly serve to increase its deterrent effect on police, particularly since those seizing the evidence here are the lawful "agents" of those seeking to use the information. This is not a situation, however, where evidence unlawfully secured from an individual is being used to impose criminal sanctions against that same individual. As the Supreme Court recognized in *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969), "we think there is a substantial difference for constitutional purposes between preventing the incrimination of a defendant through the very evidence illegally seized from him and suppressing evidence on the motion of a party who cannot claim this predicate for exclusion." The use of the evidence in this case thus does not seriously affront basic notions of justice and fair play that form in part the foundation for the exclusionary rule. In this case, as in *Calandra*, appellants' interests are adequately protected by the right to pursue a civil action for damages, the right to seek return of any evidence illegally seized, and the right to exclude the evidence in any criminal proceeding directed against them. These rights are sufficient to remedy any Fourth Amendment violation about which appellants may complain. Accordingly, we hold that the Fourth Amendment does not bar the compulsion of appellants' testimony in this case.

### B. *Questioning of Appellants Based on Unlawful Electronic Surveillance*

Appellants further contend that the District Court failed to ensure adequately that the questions to be asked them at the Kem-ber-Budlong trial would not be derived from unlawful electronic surveillance. On July 16, 1980, appellants requested that the Government conduct a search for electronic surveillance of appellants or their counsel in accordance with 18 U.S.C. § 3504(a) (1976). In response to this request, the Government admitted that the FBI conducted electronic monitoring of Leonard Boudin, counsel for appellant Mary Sue Hubbard. No electronic surveillance had been conducted of any of the appellants.

Congress and the courts have expressed a general policy that evidence obtained from unlawful electronic surveillance should not be admissible before a court or grand jury. In 18 U.S.C. § 2518(10)(a) (Supp. III 1979), Congress has provided that:

> Any aggrieved person in any trial . . . may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—
>
> (i) the communication was unlawfully intercepted;
>
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
>
> (iii) the interception was not made in conformity with the order of authorization or approval.

*See also In re Evans*, 452 F.2d 1239, 1249 (D.C.Cir.1971), *cert. denied*, 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1972).[25] This court has held that "the mere assertion" that unlawful wiretapping has been used against a party triggers the requirement of 18 U.S.C. § 3504(a)(1) that the Government "affirm or deny the occurrence of the alleged unlawful act." *Evans, supra,* 425 F.2d at 1247. In *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), and in cases decided

---

**25.** The parties seem to agree that appellants' objections are based on Boudin's *statutory* rights and not his rights under the Fourth Amendment. We note again that, under recent cases, the appellants, who are only witnesses in this case, have no standing to invoke the exclusionary rule for *unconstitutional* searches. *See United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *United States*

*v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). In the present case the Government did not dispute appellants' claim that the questions asked of appellants as witnesses at trial could not be derived from unlawful electronic surveillance conducted in violation of statutory rights. We offer no opinion on this question.

subsequent to *Alderman*, it has been established that if the Government admits that unlawful electronic surveillance was conducted *on the premises of* an individual or involved any conversation *to which that individual was a party*, then the transcriptions of, or records documenting, that surveillance must be turned over to that individual.[26]

A more difficult problem is presented where the Government admits to conducting unlawful electronic surveillance of a person connected with the individual requesting disclosure, with *no* surveillance conducted of the individual who has requested the disclosure. In such a case, the concern remains that the Government may have obtained evidence concerning the individual requesting disclosure through unlawful electronic surveillance. At the same time, to disclose such information would violate privacy rights of those persons party to the conversations. Assuming that a right exists (*see* note 25 *supra*), a conflict is presented in such a case as to how to guarantee that the Government does not improperly use information seized through unlawful electronic surveillance.

To avoid significant intrusions upon the privacy of others, this court has held that the Government's assertion that no evidence to be used at trial was obtained by unlawful surveillance is sufficient to allow the Government to proceed against the individual requesting disclosure. As stated in *United States v. Williams*, 580 F.2d 578, 585 (D.C.Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978):

> We have, then, hewed to the view that the Government's denial must generally be accepted as conclusive, and we do so again today.

The court in *Williams* also held that this denial need not be in affidavit form. *Id.* at 585 n.38.

In the present case, no surveillance was conducted of conversations on the appellants' own premises or to which appellants were a party. There was thus no need to turn over any surveillance records to the appellants. Although the Government did admit to surveillance of Leonard Boudin, counsel for one of the appellants, we believe that the Government has sufficiently demonstrated that none of the questions to be put to appellants were derived from this electronic surveillance.

In response to appellants' surveillance request, the Government submitted a letter from Assistant Attorney General Heymann stating that ten Government agencies had conducted searches to determine whether any of the appellants or their attorneys had been monitored electronically. The replies of nine of those agencies were attached to that letter, reporting no such surveillance. While the FBI admitted monitoring the conversations of Mr. Boudin, the Government submitted affidavits of its two principal prosecutors and the FBI case agent declaring that none of the investigation in this matter had been derived from electronic surveillance, and that none of the questions to be put to appellants were based on information obtained from such surveillance. Finally, the District Court heard arguments of counsel and examined *in camera* the FBI logs of the electronic surveillance of Mr. Boudin. The District Court concluded that it was clear that the intercepted conversations had no relationship to the present case.

On the basis of these facts, and in light of this court's opinion in *Williams, supra*, we believe that the District Court adequately ensured that the questions asked of appellants at trial would not be based on unlawful electronic surveillance. We find nothing in this case to warrant the imposition of procedures beyond those held sufficient in *Williams*. On the basis of the authority cited above, there is no reason why the

---

**26.** *Alderman* involved claims arising under the Fourth Amendment that were asserted by a defendant, not a witness, in a criminal proceeding. We have no occasion to decide here whether the principles enunciated in that case are equally applicable with respect to any constitutional or statutory claim asserted by a "witness" in a criminal trial. We need not address this question because no surveillance was conducted of appellants.

District Court should have allowed defense counsel to participate in examination of the FBI logs, or should have conducted a hearing at which agency representatives would testify with respect to the recording, copying, and search for relevant electronic surveillance records, as appellants contend.

We have examined each of the additional arguments raised by appellants, and find them to be without merit. As stated above, this court in *Williams* directly upheld the right of the Government to submit a denial of electronic surveillance in the form of an unsworn letter. In addition, the ten-agency search conducted by the Government in this case was sufficient to satisfy the statutory requirement that the Government "affirm or deny the occurrence of the alleged unlawful act." 18 U.S.C. § 3504(a)(1). At a minimum, the Government need only conduct a search of those agencies with responsibilities related to the subject matter of the case. *See* Note, *Claiming Illegal Electronic Surveillance: An Examination of 18 U.S.C. § 3504(a)(1)*, 11 Harv.C.R.–C.L.L. Rev. 632, 659 (1976). Finally, there is nothing in the statute that requires the Government to inquire into state or local electronic monitoring. *See* Note, *supra*, at 662.

On the basis of the foregoing, we hold that, on the facts in this case, the alleged unlawful electronic surveillance of an appellant's counsel did not bar the compulsion of appellants' testimony.

### C. *Claims Pertaining to the Grants of Immunity*

Appellants offer four additional grounds upon which they claim that the Government's grants of immunity to the appellants

were unlawful. They urge this court to exercise its supervisory authority over the administration of criminal justice to reverse the contempt order on these grounds.[27] We have examined each of appellants' arguments, and find them to be without merit.

First, appellants contend that the grant of immunity was improper because contrary to guidelines set forth in the *United States Attorneys' Manual*.[28] We believe that this argument must fail for the simple reason that the grants of immunity were not contrary to the guidelines set forth in the *Manual*. It must be recalled that a conviction has already been secured by the Government against each of the appellants. Moreover, appellants admit that the *Manual* itself states that the guidelines are not binding. Finally, we do not believe that the general guidelines established by the *Manual* are judicially enforceable, particularly since these guidelines do not reflect constitutional concerns. *Accord, Beverly v. United States*, 468 F.2d 732 (5th Cir. 1972); *see also United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

Second, appellants contend that the grants of immunity were improper because the Government made no showing that the testimony of the appellants was "necessary." *See In re Vericker*, 446 F.2d 244 (2d Cir. 1971) (involving immunity granted to a witness called to testify before a grand jury). In response, the Government argues that no such showing is required when the evidence is presented to prove guilt beyond a reasonable doubt at a criminal trial, and that, in any event, an adequate showing of

27. We have been cautioned against invocation of supervisory authority in disregard of the considered limitations of the law. *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980).

28. The *Manual* contains the following three guidelines that appellants assert were violated in this case: one guideline, § 1–11.212, states that the Government should consider "whether substantially the same benefit can be obtained from someone else without resort to the compulsion order;" another consideration is set forth in § 1–11.214, which states that "[i]n the

absence of unusual circumstances it would not be in the public interest to compel testimony of a high ranking principal of a criminal enterprise in order to convict one of his subordinates;" a third guideline, § 1–11.215, states that the Government "should consider the possibility of securing the witness's conviction before asking the court to compel his testimony." The guidelines also stress the requirement of 18 U.S.C. § 6003 that a witness not be compelled to testify under a grant of immunity unless it is necessary to obtain the testimony "in the public interest."

necessity was made in this case. We agree with the Government that, in the circumstances this case presents, sufficient cause exists for compelling appellants' testimony. The Government has demonstrated that all four appellants can provide non-cumulative, first-hand evidence of the involvement of Kember and Budlong in the commission of the crimes with which they are charged. The appellants' testimony would assist the jury in understanding the full role played by the defendants in the crimes charged. The information appellants can relate would surely contribute to "the search for the truth" in this case.

■ Third, appellants contend that the compulsion of testimony from Mrs. Hubbard would violate the terms of the disposition agreement entered into between the Government and Mrs. Hubbard. That agreement provides in relevant part:

The government retains the right to allocute on matters in any fashion it chooses as to all defendants except the defendant Hubbard. As to the defendant Hubbard, the government agrees to advise the Court as follows: "the government takes no position and is making no request on the matter of sentence with respect to the defendant Hubbard." It is understood that Mrs. Hubbard, through her counsel, will make no statement *in allocution* concerning the facts of the case.

*United States v. Hubbard*, Crim.No. 78–401, Memorandum Opinion at 10 (October 8, 1979) (Richey, J.). Appellants assert that the Government here seeks to elicit from Mrs. Hubbard the very same damaging statements that the Government is forbidden to give to the sentencing court.

It is plain that the subpoena for Mrs. Hubbard's testimony in this case calls for no statement by her or by the Government to *the sentencing court.* An allocution is a statement to the *sentencing judge* before a sentence is pronounced. *See United States v. Foss,* 501 F.2d 522, 530 n.3 (1st Cir. 1974). Mrs. Hubbard is being compelled to testify

in a trial separate from her own. Such testimony is not an allocution in violation of the disposition agreement. Safeguards exist to assure that anything Mrs. Hubbard may say at the Kember-Budlong trial is not called to the attention of the sentencing judge.[29]

■ Fourth, appellants claim that the grants of immunity in this case were improper because the Government denied Mrs. Hubbard's motion in her own trial to secure the testimony of defendant Kember pursuant to a grant of immunity. Appellants argue that to require the testimony of Mrs. Hubbard and the other appellants in the trial of Kember and Budlong, when the Government refused to grant immunity to Mrs. Kember in the trial of appellant Hubbard, violates the rights of the appellants to due process of law, to the equal protection of the laws, and to a fair trial, as guaranteed by the Fifth and Sixth Amendments.

Initially, we note that many of these arguments are more appropriately raised by appellants in attacking their own convictions. Similarly, any impropriety by the Government affecting the fairness of the trial of defendants Kember and Budlong may be raised by those defendants in their own right. We express no view as to the likelihood of success of such arguments should they be raised by appellants or by Kember and Budlong as defendants.

Courts have long recognized that grants of immunity are largely made at the discretion of the executive and legislative branches of the Government. *See Government of the Virgin Islands v. Smith,* 615 F.2d 964 (3d Cir. 1980). At the time that the Government refused Mrs. Hubbard's request that immunity be granted to Mrs. Kember, Kember was in the United Kingdom, challenging the extradition request of this country. Moreover, Kember was a co-defendant charged with the same crimes in the same indictment with appellants. We find, therefore, that no manipulation or bad

---

29. *See, e. g., United States v. Wilson,* 488 F.2d 1231 (2d Cir. 1973), *rev'd on other grounds,* 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975).

faith on the part of the Government is uncovered by the fact that the Government granted immunity to Hubbard but refused to grant immunity to Kember. At the time that immunity was considered for each witness, Hubbard and Kember stood in very different positions before the Government. The failure of the Government to treat them in the same way does not illustrate a "subversion of the immunity process" by the Government, as appellants contend.

In summary, we find no reason to exercise whatever supervisory authority we may have over the administration of criminal justice to reverse the contempt order on the basis of the grants of immunity to appellants.

### D. *Allegations of Bad Faith*

 Appellants lastly contend that the Government's attempt in this action to compel them to testify at the trial of defendants Kember and Budlong is based on bad faith, vindictiveness, and unconstitutional purposes. As a result, appellants argue that the District Court should have granted appellants' motions to quash the subpoenas or, in the alternative, that the District Court at least should have granted appellants' requests for an evidentiary hearing to examine their allegations.

We do not deny that the circumstances surrounding this action are unusual. Upon consideration, however, we are unable to conclude that the Government sought the testimony of these appellants in bad faith or with a purpose to be vindictive. There simply is not sufficient evidence that the Government sought this testimony for any reason other than to build as strong a case as possible to present to the jury, and to convince that body that defendants Kember and Budlong were guilty beyond a reasonable doubt. This conclusion is buttressed by the Government's explanation to the District Court that appellants were the only people in the alleged conspiracy who had dealt directly with defendants Kember and Budlong. On the basis of the record in this case, we are unable to conclude that appellants have met their burden of proving bad faith, prosecutorial vindictiveness, or harassment. *See United States v. Peskin*, 527 F.2d 71 (7th Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976); *United States v. Catlett*, 584 F.2d 864 (8th Cir. 1978). There was no error in the denial of appellants' motions by the District Court.

### VI

For all of the foregoing reasons, the decision of the District Court is affirmed.